**Brandon Kirk LAIR, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 01–07–00414–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

July 3, 2008.

Brian W. Wice, Houston, for Appellant.

Shirley Cornelius, Asst. Dist. Atty.–Harris County, Houston, for Appellee.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

JANE BLAND, Justice.

A jury found appellant, Brandon Kirk Lair, guilty of the offense of possession of a controlled substance, namely methylenedioxy methamphetamine (commonly known as "ecstasy"), weighing between 200 and 400 grams,[1] and, after appellant pleaded "true" to the allegation in one enhancement paragraph that he had been previously convicted of a felony offense, assessed his punishment at confinement for 70 years. In five points of error, appellant contends that the evidence is legally and factually insufficient to support his conviction, the trial court erred in overruling his objections after the State improperly commented on his failure to testify and on matters outside of the record, and he received ineffective assistance of counsel during the punishment phase of trial.

We reverse the portion of the judgment imposing punishment, affirm the judgment in all other respects, and remand the cause for a new punishment hearing.

## Facts and Proceedings

On the night of September 21, 2006, Federal Bureau of Investigation Special Agent J. Chiue was conducting surveillance at a strip shopping center near Bel-

---

1. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.103(a)(1) (Vernon 2003 & Supp.2007), § 481.116(d) (Vernon 2003). We note that, although the indictment and conviction reference possession of methylenedioxy methamphetamine in an amount of more than 200 grams but less than 400 grams, the applicable offense of which appellant could have been convicted involved the possession of methylenedioxy methamphetamine, in an amount of more than four grams but less than 400 grams. *See id.*

laire Boulevard in Houston, Texas. Chiue worked with Houston Police Department officers on an organized crime task force. Chiue initiated the surveillance after receiving information that the center, which contained a pool hall and bar, was a "hot spot" for criminal activity, including drug transactions. Agent Chiue parked in the center's parking lot in an unmarked car. As Chiue surveyed the area, an Asian male, later identified as Son Hoang, parked next to him in a green Honda. Chiue then noticed a Red Dodge Magnum pull into the parking lot and park. Chiue found this to be unusual, because the center was "mainly frequented by Asians" and the men in the Dodge were African–American. When Hoang saw the Dodge, he got out of the Honda holding a brown paper lunch sack, and began to walk toward the Dodge, which was parked in the center's lot about six car lengths from Chiue. Hoang carried the brown paper sack "wadded up." The Dodge was occupied by a driver, later identified as appellant, and a passenger, later identified as Triston Davis. As Hoang approached, both appellant and Davis exited the Dodge and greeted Hoang. All three men then entered the Dodge, with appellant in the driver's seat, Davis in the passenger's seat, and Hoang in the back seat.

Although Agent Chiue's view into the Dodge was partially blocked, he observed that the three men remained inside the Dodge for about 30 seconds. Hoang then exited the Dodge from the back seat and returned to the Honda, empty-handed. Appellant and Davis then left the parking lot. A short time later, an unidentified Asian male left the pool hall and joined Hoang in the Honda. Chiue then observed Hoang and this unidentified man counting money in the Honda. Chiue radioed Houston Police Sergeant M. Landry,

who was working with Chiue, and told him that he suspected that a drug transaction had occurred.

Chiue agreed that the surveillance was random, he had never heard of appellant, Davis, or Hoang, he did not see what went on inside the Dodge, and he did not see anything change hands. Chiue further agreed that he did not see appellant touch or look inside the brown paper sack, hand over any money, act nervous, drive in a dangerous manner, or use a cell phone or beeper. Chiue also stated that he did not know whether the money Hoang counted came from Hoang or the other Asian man who left the pool hall to join him in the Honda. Chiue did not overhear any of the conversation between appellant, Davis, and Hoang. Chiue also admitted that anything could have been delivered in the brown paper sack and that the delivery of the sack, by itself, could be consistent with both innocent and criminal activity. In Agent Chiue's opinion, however, the conduct he observed was consistent with a hand-to-hand drug transaction. Chiue noted that it is common for buyers in hand-to-hand drug transactions to arrive in pairs for safety.

Sergeant Landry testified that officers previously had observed a lot of criminal activity in the center's lot, including drug use and fights. Officers had also observed various people coming into the parking lot, meeting individuals, and then leaving, and, based on Landry's experience, these "short transactions" were drug sales. Landry was parked one block north of the parking lot when he noticed a burgundy car occupied by two black males pull into the center's parking lot.[2] Landry described this as an "oddity in that area." Landry received radio communication from Chiue about what was happening, and, when the

---

**2.** The record indicates Landry was referring to the red Dodge referred to by Chiue.

Dodge left the parking lot, Landry and other officers followed it for 10–15 minutes. The Dodge ultimately ran a red light, sped, and changed lanes without using signal devices, and, after a marked patrol car arrived, officers stopped the Dodge.

Officers asked appellant, who was the driver, and Davis, who was the passenger, to exit the car. Appellant complied with the officers' instructions, and they placed him in a patrol car. Davis, who was very nervous and was "not as relaxed" as appellant, did not comply until the officers asked several times. As Davis got out of the car, "his elbow hit the console," which was between the bucket seats, and the console "clicked as if it had not been shut completely." Landry searched the Dodge, opened the console, and found the brown paper sack described by Chiue. Inside the sack, Landry discovered 1000 blue pills in three plastic sandwich bags. Police later confirmed that the pills were ecstasy.

Landry testified that it was his understanding, based on Chiue's radio communications, that Hoang had handed the sack through the Dodge's passenger's window, but did not get into the Dodge. Landry did not know whether appellant or Davis knew Hoang before their transaction. Landry agreed that appellant was not driving dangerously, and Landry did not believe that appellant or Davis knew they were being followed by police officers. Landry further agreed that appellant pulled over when the patrol car's lights went on, followed the officers' instructions, did not appear to be under the influence of any drugs, did not attempt to flee, and promptly complied with the officers' instructions to get out of the car. Landry stated that, compared to Davis, appellant appeared relaxed. Landry did not see appellant make any furtive movements, put his hands or anything in the console, or

touch the brown paper sack. Appellant's prints were not found on the plastic bags contained in the sack, although Hoang's prints were found on the bags. Landry agreed that ecstasy does not have a distinctive odor. Appellant did not have any weapons or large amounts of cash.

Landry opined that, as the driver of the Dodge, appellant "would know what was coming into his vehicle." Landry agreed that the Dodge was registered to another person, but maintained that because appellant had care and custody of the car, appellant was the owner at that point in time. Landry stated that the area, time, and place that appellant met with Hoang led him to believe appellant "knew what he was doing."

## Legal and Factual Sufficiency

In his first two points of error, appellant contends that the evidence is legally and factually insufficient to support his conviction for the knowing possession of ecstasy. Appellant contends that the evidence is legally insufficient because it lacks sufficient affirmative links between the drugs and appellant—the contraband was not in plain view; there was no odor of contraband in the car because ecstasy has no odor; appellant had no additional contraband or drug paraphernalia on his person; appellant was not under the influence of drugs at the time of his arrest; appellant cooperated with police and did not engage in conduct indicating a consciousness of guilt like furtive gestures, or attempts to flee or conceal or destroy evidence; appellant made no incriminating statements; the car that appellant was driving was not registered to appellant; appellant was not armed; no one saw appellant handle the sack in which the contraband was found; and appellant's fingerprints were not found on

the bags containing the contraband.[3] Appellant asserts that the evidence is factually insufficient for the same reasons.

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex.Crim.App.2005). We note that the trier of fact is the sole judge of the weight and credibility of the evidence. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim.App.2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App. 2000).

In a factual sufficiency review, we view all the evidence in a neutral light, both for and against the finding, and set aside the verdict if the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, i.e., that the verdict seems "clearly wrong and manifestly unjust," or the proof of guilt, although legally sufficient, is nevertheless against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App.2006). We note that a jury is in the best position to evaluate the credibility of witnesses, and we afford "due deference" to the jury's determinations. *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App.2006).

■ A person commits the offense possession of a controlled substance, namely methylenedioxy methamphetamine, in an amount of more than four grams but less than 400 grams, if he knowingly or intentionally possesses the controlled substance in the prescribed amount, by aggregate weight, including adulterants or dilutants. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.103(a)(1) (Vernon 2003 & Supp. 2007), § 481.116(d) (Vernon 2003). To prove possession, the State must prove that (1) the accused exercised control, management, or care over the substance; and (2) the accused knew the matter possessed was contraband. *Evans v. State*, 202 S.W.3d 158, 161 (Tex.Crim.App.2006).

■ If, as here, a defendant does not have exclusive possession of the place where the contraband is found, then independent facts and circumstances must link him to the drugs. *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex.Crim.App.2005) (holding that evidence was sufficient to link defendant to drugs contained in brown paper bag where bag was hidden in appellant's house and confidential informant had disclosed location to police). Regardless of whether the evidence is direct or circumstantial, it must establish that the defendant's connection with the drug was more than fortuitous. *Evans*, 202 S.W.3d at 161–62. "Mere presence at the location where drugs are found is thus insufficient, by itself, to establish actual care, custody, or control of those drugs." *Id.* at 162. However, presence or proximity, when combined with evidence of other links, either direct or circumstantial, can be sufficient to establish that element beyond a reasonable doubt. *Id.* It is not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial. *Id.*

---

**3.** Appellant further asserts that appellant's co-defendant, Davis, was granted a motion for instructed verdict "on facts even stronger than those in appellant's case."

Texas courts have set forth a non-exclusive list of possible links that may be sufficient, either singly or in combination, to establish a person's possession of contraband. *Id.* at 162 n. 12. These links are:

(1) the defendant's presence when a search is conducted;

(2) whether the contraband was in plain view;

(3) the defendant's proximity to and the accessibility of the narcotic;

(4) whether the defendant was under the influence of narcotics when arrested;

(5) whether the defendant possessed other contraband or narcotics when arrested;

(6) whether the defendant made incriminating statements when arrested;

(7) whether the defendant attempted to flee;

(8) whether the defendant made furtive gestures;

(9) whether there was an odor of contraband;

(10) whether other contraband or drug paraphernalia were present;

(11) whether the defendant owned or had the right to possess the place where the drugs were found;

(12) whether the place where the drugs were found was enclosed;

(13) whether the defendant was found with a large amount of cash; and

(14) whether the conduct of the defendant indicated a consciousness of guilt.

*Id.* Here, viewing the evidence in the light most favorable to the verdict, Agent Chiue testified that, as he was conducting surveillance at the shopping center after receiving information that the center was a known location for drug transaction activity, Hoang parked next to him. Upon seeing appellant pull into the parking lot, Hoang exited his Honda holding a brown paper lunch sack in a manner that led him to believe the sack did not contain a sandwich. Hoang walked over to the Dodge, and appellant and Davis exited the Dodge. Appellant and Davis together greeted Hoang outside the Dodge, and then all three men entered the Dodge. Hoang stayed in the vehicle for about 30 seconds. When Hoang exited the Dodge, he was empty-handed—no longer carrying the brown paper sack. Chiue then saw Hoang and another man in Hoang's Honda counting money. Based on his experience, Chiue concluded that a drug transaction had occurred.

The State presented evidence that appellant and Davis together greeted Hoang as he approached them in the parking lot, all three men got into the car being driven by appellant, thus concealing their actions from plain view, all three men remained in the car for 30 seconds, Hoang then exited the car empty-handed and without the sack, and then counted money with a companion, causing Chiue to conclude he had observed a hand-to-hand drug transaction. Further, Landry testified that after he conducted a traffic stop of the Dodge, Landry opened the console and found the sack described by Chiue containing the narcotics. Thus, the State presented evidence that the narcotics, located in the center console, were conveniently accessible to appellant and that appellant, as the driver, owned or had the right to possess the car where the narcotics were found. The State also presented evidence that, prior to Davis's exiting the car, the center console in which the narcotics were located was not completely closed, which, coupled with the evidence of Hoang's suspicious behavior, gives rise to a reasonable inference that the sack in which the narcotics were located had been visible before appellant and Davis exited the Dodge. The fact that

the narcotics were secured in the console constitutes evidence of an affirmative link—that the narcotics were secreted in an enclosed space. We conclude that these facts, in combination, provide sufficient logical force to establish appellant exercised control over the narcotics and that his relationship to them was more than fortuitous. *See Robinson v. State*, 174 S.W.3d 320, 326 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd) (affirming possession conviction of front-seat passenger in truck where cocaine was located in factory compartment in back wall of truck, and noting that cocaine was within vicinity and easily accessible to passenger).

The presence of Davis in the Dodge does not render these links legally insufficient to prove that appellant (1) exercised control over the substance by transporting it in his vehicle and (2) knew the matter he possessed was contraband, from his greeting of Hoang, the invitation to Hoang to enter his vehicle for 30 seconds, and the transfer of the brown paper bag that Hoang had carried into appellant's vehicle in his presence. *See Poindexter*, 153 S.W.3d at 412 ("The mere fact that a person other than the accused might have joint possession of the premises does not require the State to prove that the defendant had *sole* possession of the contraband, only that there are affirmative links between the defendant and the drugs such that he, too, knew of the drugs and constructively possessed them.") (emphasis in original); *Evans*, 202 S.W.3d at 166 (concluding that the circumstantial evidence, "when viewed in combination and its sum total, constituted amply sufficient evidence connecting appellant to the actual care, custody, or control of narcotics").

In support of his legal sufficiency points, appellant relies on *Lassaint v. State*, 79 S.W.3d 736 (Tex.App.-Corpus Christi 2002, no pet.), and *Kyte v. State*, 944 S.W.2d 29

(Tex.App.-Texarkana 1997, no pet.), in which the reviewing courts concluded that the evidence was insufficient to support the appellants' possession convictions. But the facts of those cases are distinguishable, particularly in that none involved evidence that the transfer of drugs took place in the defendant's presence inside his vehicle. In *Lassaint*, the narcotics were secreted in a speaker box in a car that was not occupied by the appellant. 79 S.W.3d at 743. There was no evidence that the appellant ever exercised any ownership or control over the car in which the narcotics were located or even knew of the existence of the speaker box where the narcotics were secreted. *Id.* Thus, the narcotics were neither in close proximity nor conveniently accessible to the appellant. *Id.* at 744. In *Kyte*, the evidence showed that the narcotics were located under the floor mat, hidden from view, in a car that a garage owner had temporarily loaned to the appellant while he repaired her truck. 944 S.W.2d at 33.

We similarly distinguish the dissent's reliance on *Roberson v. State*, 80 S.W.3d 730, 742 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). In *Roberson*, the defendant was the driver of the vehicle in which police discovered cocaine, but the only other evidence linking the defendant to the cocaine was his denial of a close relationship to the other occupants of the vehicle. Unlike the record before the court in *Roberson*, here, evidence exists that the transfer of the narcotics to appellant's vehicle took place in his presence, facilitated by his inviting Hoang into the back seat.

In concluding that the evidence in this case is legally sufficient, we are mindful of the Court of Criminal Appeals' admonition that "[a]lthough the parties may disagree about the logical inferences that flow from undisputed facts, where there are two permissible views of the evidence, the fact

finder's choice between them cannot be clearly erroneous." *Evans,* 202 S.W.3d at 163 (internal quotations omitted) (reversing court of appeals' determination of legal insufficiency, holding that it was error not to view reasonable inferences in light favorable to jury's verdict). We conclude that a rational trier of fact could have found, beyond a reasonable doubt, that appellant knowingly possessed the narcotics. Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction.

Viewing the evidence neutrally, we recognize that appellant was not under the influence of the narcotics, did not possess other contraband, did not make any incriminating statements, did not attempt to flee, did not make furtive gestures, and did not exhibit conduct indicating a consciousness of guilt. We also note that there is no evidence that there was any drug paraphernalia present in the Dodge or on appellant's person. Landry confirmed that there was no odor of narcotics present in appellant's car, but he also testified that ecstasy, unlike some other narcotics, does not have a strong odor. Appellant also was not in possession of a large amount of cash. Further possible links that do not exist, however, do not negate the links that are present. *Evans,* 202 S.W.3d at 164 (rejecting court of appeals' determination of legal insufficiency that was based in part on recitation of links that "did not exist in this case"). There was evidence that appellant was not the registered owner of the Dodge, but it was undisputed that the appellant was the driver before and after his meeting with Hoang and at the time the officers stopped him for a traffic violation. Appellant greeted Hoang, invited him into his car for 30 seconds, and the brown paper sack of drugs remained in the car as Hoang left and appellant drove away. In light of the evidence supporting the jury's verdict, we conclude that the evidence is not so obviously weak that the verdict is clearly wrong and manifestly unjust, or that the proof of guilt is against the great weight and preponderance of the evidence. Accordingly, we hold that the evidence is factually sufficient to support appellant's conviction.

### State's Comment on Appellant's Failure to Testify

In his third point of error, appellant contends that the trial court erred in overruling his objection after the State improperly commented during its final argument in the guilt stage of trial on appellant's failure to testify. Specifically, appellant complains of the following comment:

COUNSEL FOR THE STATE:.... Defense counsel asked how do we know, how do we know that [appellant] knew what was in that bag? I told you back in voir dire that the Defendant always, not just in this case, always has the Fifth Amendment right not to testify against himself. As you've seen in this case he's exercised that right.... But if you think about what Defense counsel is asking you to do is prove how do we know, how do we know what Mr. Lair knew. Well, I can't pop the top on Mr. Lair's head.

DEFENSE COUNSEL: That's improper comment on failure to testify.

THE COURT: Overruled. Ladies and gentlemen, you are not to take into consideration whether or not the Defendant chose to take the stand. It will tell you that in the court's charge.

The State asserts that this argument was invited by defense counsel's jury argument, in which he stated, "[W]here is the evidence that [appellant] knew what was in that bag. Ask [the State] to answer that

question.... Where is the proof that [appellant] knew what was in that bag?"

*Error Analysis*

■■■ Permissible jury argument falls within one of four categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App. 2000); *Strain v. State*, 126 S.W.3d 207, 209 (Tex.App.-Houston [1st Dist.] 2003, no pet.). Jury argument by the State that refers to a defendant's failure to testify violates the defendant's Fifth Amendment right against compelled self-incrimination. *Bustamante v. State*, 48 S.W.3d 761, 764 (Tex.Crim.App.2001); *see also* Tex.Code Crim. Proc. Ann. art. 38.08 (Vernon 2005) ("Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause."). "To violate the right against self-incrimination, the offending language must be viewed from the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must be clear." *Cruz v. State*, 225 S.W.3d 546, 548 (Tex.Crim.App.2007). "It is not sufficient that the language might be construed as an implied or indirect allusion." *Id.* "The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify." *Id.* In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character. *Id.*

Here, we conclude that the State's comment, "Well, I can't pop the top on Mr. Lair's head," after commenting that appellant had chosen to exercise his right not to testify, constituted an improper comment on appellant's failure to testify. *See Koller v. State*, 518 S.W.2d 373, 375 (Tex.Crim. App.1975) (holding that State's comment, among others, that "We still don't know what the motive was. We still don't know what the full facts were of this murder ... [a]nd it's within [the appellant's counsel's] control to bring you those blanks, but he won't bring them to you," constituted improper comment on appellant's failure to testify); *Minton v. State*, 162 Tex.Crim. 358, 285 S.W.2d 760, 761 (1956) (holding that comment, "We cannot open up [the appellant's] head and tell what was in his mind" constituted improper comment on appellant's failure to testify); *Sanders v. State*, 123 Tex.Crim. 409, 59 S.W.2d 1116, 1116 (1933) (holding that comment, "[W]e cannot tell you whether this defendant knew that car was stolen or not; we cannot go over there where he sits and split his mind open with an axe and show it to you" constituted improper comment on appellant's failure to testify).

We reject the State's argument that its comment was invited. Although the State did not cite any legal authority for its proposition that the State's comments were invited, our research indicates that courts that have applied this rationale have done so on facts distinguishable from those presented in the instant case. *See Aitch v. State*, 879 S.W.2d 167, 175 (Tex.App.-Houston [14th Dist.] 1994, pet. ref'd) (stating that "prosecutor may refer to an accused's failure to testify in closing argument when such comment is invited by defense counsel's closing argument"). In *Aitch*, the defense counsel "suggested the State had presented no evidence proving appellant knew the items were stolen, and that *it was impossible* for the State to prove that element of the offense." 879 S.W.2d at 175 (emphasis added). On these

facts, the court of appeals concluded that the State's rebuttal, in which it commented that it could not "walk over to [the appellant's] mind, open it up and pull out an intent" and it could not "call appellant to the stand," were invited by the defense counsel's prior comments. *Id.* Similarly, in *Sanchez v. State,* the court of appeals concluded that the State was permitted to respond to defense counsel's comments insinuating that the State could have, but failed to, prove "what was in [the] appellant's head." 837 S.W.2d 791, 794 (Tex. App.-Houston [14th Dist.] 1992, pet. ref'd). Finally, in *Zertuche v. State,* defense counsel argued, "How can [the State] tell you about [the appellant's] intent when only a person, only you, yourself, in your mind, your only intent, how can they say he had the intent to possess it when there is no evidence of his mental state, no evidence at all?" 774 S.W.2d 697, 699 (Tex.App.-Corpus Christi 1989, pet. ref'd). The court concluded that, in response, the State was entitled to comment, "Counsel just got through telling you that we did not show what the defendant's state of mind was. Remember when he said that? Well, how can I possibly show you what his state of mind is? He exercised his right to remain silent." *Id.*

■ The facts here, in regard to the State's theory of invitation, are much different. In making his comments, appellant's counsel did not open the door to allow the State to comment on appellant's failure to testify. *See Hunter v. State,* 956 S.W.2d 143, 145 (Tex.App.-Amarillo 1997, pet. ref'd) (noting that defendant may open door to such comments by State by "attempting to explain away or otherwise minimize the significance of his silence," "suggesting that his [ ] silence somehow entitles him to some beneficial inference or other advantage," or "interject[ing] tidbits about his silent client's knowledge, feel-

ings, or potential testimony)." Here, appellant's trial counsel did not refer to or otherwise mention his client's silence in making his argument and, instead, "merely questioned whether the State proved an element of the crime." *Id.* We conclude that appellant's trial counsel's argument "was not tantamount to inviting the prosecutor to comment upon appellant's failure to testify." *Id.*

*Harm Analysis*

■ In this case, the trial court overruled, rather than sustained, the objection to the prosecutor's comment, subjecting the error to a harm analysis. *See Archie v. State,* 221 S.W.3d 695, 699 (Tex.Crim. App.2007); *Hawkins v. State,* 135 S.W.3d 72, 76–77 (Tex.Crim.App.2004) (noting that "a harm analysis is employed only when there is error" and that analysis applies federal precedent in cases in which constitutional rights are implicated); *Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Crim. App.1989). Because appellant asserts that the State's improper comment on a defendant's failure to testify violates both federal constitutional privileges as well as article 38.08 of the Texas Code of Criminal Procedure, we view the State's comment for constitutional harm under Texas Rule of Appellate Procedure 44.2(a), and we should reverse unless we determine beyond a reasonable doubt that the error did not contribute to the defendant's conviction or punishment. *See* TEX.R.APP. P. 44.2(a); *Wimbrey v. State,* 106 S.W.3d 190, 192 (Tex.App.-Fort Worth 2003, pet. ref'd). Our primary inquiry is what effect the error had, or reasonably may have had, on the jury's decision. *Id.* "We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would likely encourage the State to repeat it with

impunity." *Wimbrey,* 106 S.W.3d at 193. "This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not in the light most favorable to the prosecution." *Id.*

Here, appellant's knowledge of possession of narcotics was contested at trial, with our dissenting colleague concluding that the record in this case is legally insufficient to prove knowing possession. This weighs in favor of finding the error to be harmful. The prosecutor's improper comment, however, was a small part of its closing argument—the prosecutor did not make any other comments of this nature. When the State continued its argument after the objection and the trial court's ruling and instruction, the prosecutor clarified that the jury was entitled to make reasonable inferences based on the evidence presented to find that appellant had knowledge that he possessed narcotics.

Although we have held the trial court erred when it overruled appellant's objection to the comment, we note that immediately after overruling appellant's objection, the court, *sua sponte,* instructed the jurors, "You are not to take into consideration whether or not the Defendant chose to take the stand." The trial court further reminded the jurors that this admonish-

ment would appear again in the trial court's charge. The charge that the trial court ultimately gave the jury instructed the jury that it was appellant's right not to take the stand and that appellant's exercising of this right could not be taken into consideration against him. The trial court's express and specific instruction at the time the prosecutor made the comment weighs in favor of finding the error to be harmless. *See id.* (assuming that trial court incorrectly overruled appellant's objection to State's improper comment on appellant's failure to testify, trial court subsequently de-emphasized importance of comment to jury with its comment, "This is argument. It's not evidence. Let's move on."). The jury is presumed to follow the trial court's instructions, and thus the impact of the State's comment and the trial court's ruling was negated by the instruction. *See Colburn v. State,* 966 S.W.2d 511, 520 (Tex.Crim.App.1998). In light of the trial court's instruction both at the time of the objection and in the jury charge, and the focus of the remainder of the State's closing argument on the evidence permitting the inference of knowledge, we conclude beyond a reasonable doubt that the error did not contribute to appellant's conviction.[4]

4. In support of his assertion that the State's comment requires reversal, appellant cites, among other cases, *Shepherd v. State,* 915 S.W.2d 177 (Tex.App.-Fort Worth 1996, pet. ref'd), *Norton v. State,* 851 S.W.2d 341 (Tex. App.-Dallas 1993, pet. ref'd), and *Roberson v. State,* 100 S.W.3d 36 (Tex.App.-Waco 2002, pet. ref'd), all of which are distinguishable. In *Shepherd,* in reversing the appellant's conviction, the court noted, in regard to the State's improper comment on the appellant's failure to testify, that that the "error was repeated by the prosecutor, the court repeatedly instructed the prosecutor to change the subject, [ ] the court's instruction was not an especially strong admonition to the jury, ... [and] [t]he prosecutor's argument was a direct reference to what [the appellant] did

not say at the scene and an indirect reference to what the jury had not heard [the appellant] say at trial." 915 S.W.2d at 181. In *Norton,* in reversing appellant's conviction, the court concluded that the prosecutor's statement, "There were only two people out there and we heard from one of them," was a direct comment on the appellant's failure to testify and "was so inflammatory that the court's instruction to the jury to disregard did not cure the error." 851 S.W.2d at 346. In *Roberson,* in reversing the appellant's conviction, the court concluded that after the prosecutor commented that the appellant had never denied committing the crime and after the prosecutor continued with improper comments after the trial court sustained, the appellant's objections, the court could not say

We overrule appellant's third point of error.

### State's Comment on Matters Outside of Record

In his fourth point of error, appellant contends that the trial court erred in overruling his objection after the State improperly commented on matters outside of the record. Appellant complains of the emphasized portion of the following argument by the State:

Testimony was that both got out to greet the Asian male that [sic] was bringing the drugs, and then they got back inside the car. What were they talking about? Do you think it is reasonable to say they were talking about politics? Does that make any sense? Is it reasonable to say they were talking about current events? Now, we're talking about 40 seconds worth of a transaction here, it's a potentially dangerous transaction. Both parties want to get in and out. Its an illegal narcotics transaction. . . . . What they're talking about, this is reasonable for you to infer, that they have the money to pay for the drugs, and they're looking inside the bag to see whether or not they're getting what they're paying for, to make sure as soon as the Asian male leaves . . . they're not standing there holding a bag with a little bouquet of flowers. . . . *They want to make sure its ecstasy [sic], and they're going through the bag. They're making sure that the amount—*

(emphasis added). Appellant objected that there was no testimony that anyone looked in the bag, and the trial court overruled the objection. The State then continued, "That's exactly what was going on in that car. And that's exactly what [appellant] was privy to. That's how we got to knowl-

edge, just in part." Appellant did not object to these follow up comments.

The State cannot use closing argument to get before the jury evidence that is outside the record and prejudicial to the accused. *Everett v. State,* 707 S.W.2d 638, 641 (Tex.Crim.App.1986). Arguments referencing matters that are neither in evidence nor inferable from the evidence are usually "designed to arouse the passion and prejudices of the jury and as such are highly inappropriate." *Borjan v. State,* 787 S.W.2d 53, 57 (Tex.Crim.App.1990); *Thompson v. State,* 89 S.W.3d 843, 850 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). However, the State is allowed wide latitude in drawing inferences from the evidence that are "reasonable, fair, legitimate and offered in good faith." *Shannon v. State,* 942 S.W.2d 591, 597 (Tex.Crim. App.1996).

Here, the State accurately observed, in its argument, that in order for the jury to "arrive at the point" of knowledge on the part of appellant, the jurors would need to "make reasonable inferences as to what [the appellant] did or did not know." The State then asked the jurors to "make sense" of the evidence that Hoang arrived at the center with the sack, after appellant and Davis greeted Hoang they entered the car being driven by appellant, all three men remained in the Dodge for 30 seconds, Hoang left empty-handed, and officers subsequently recovered the sack containing narcotics in the center console of the car being driven by appellant. In the context of the above argument, the State candidly conceded it did not "have any audio" as to what was being inside the car, but noted that it did have evidence of "the result of the transaction" of over 1000 ecstasy pills. In order to establish knowl-

"with any confidence that the persistence and flagrancy with which [the State] engaged in

*this inappropriate argument did not impact the punishment phase."* 100 S.W.3d at 43.

edge, the State urged the jurors to make reasonable inferences as to what was going on inside the car. We hold that the State's comment was permissible as it constituted a plea for the jurors to make reasonable deductions from the evidence. *See Wesbrook*, 29 S.W.3d at 115.

We overrule appellant's fourth issue.

### Ineffective Assistance

In his fifth point of error, appellant contends that he received ineffective assistance of counsel during the punishment phase of trial. Appellant complains that his trial counsel called only one witness during the punishment phase, who provided only brief testimony, and that his trial counsel failed to investigate, interview, and present other witnesses on appellant's behalf who were available and willing to testify.

In order to prove an ineffective assistance of counsel claim, a defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness, and (2) but for his counsel's unprofessional error, there is a reasonable probability that the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Vasquez v. State*, 830 S.W.2d 948, 949 (Tex. Crim.App.1992). A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. In reviewing counsel's performance, we look to the totality of the representation to determine the effectiveness of counsel, indulging a strong presumption that his performance falls within the wide range of reasonable professional assistance or trial strategy. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App.1999). Furthermore, a claim of ineffective assistance must be firmly supported in the record. *Id.*

Here, at the punishment phase, appellant presented a single witness, his sister-in-law, Tammy Walker, who testified that appellant was a father of two with another child on the way, she knew that appellant had been in trouble with the law before, she had been around appellant after appellant was released from jail a couple years before, appellant had been working for a trucking company and was now doing "hot shot delivery" with a van he bought, appellant had been working steadily since he got out of jail, appellant had a common law wife who was pregnant, appellant supported his children, and appellant spent a lot of time with his girls.

Appellant moved for a new trial, and attached affidavits from almost two dozen witnesses, including appellant's friends, neighbors, and relatives, all of whom stated that they were not contacted by appellant's trial counsel and that they were ready, willing, and able to testify on appellant's behalf at the punishment stage. In these affidavits, which were introduced into evidence at the hearing on the motion for new trial, these witnesses averred that they would have testified on behalf of appellant that, although they were familiar with appellant's troubles with the law, appellant was always willing to help people, appellant loved spending "countless hours" with his children and worked with them to improve their grades and get them involved in school activities, appellant's main concern was his children, appellant was intelligent, capable, and personable, appellant helped around his neighborhood, appellant demonstrated honesty through specific acts and a giving and generous nature, appellant worked countless hours to support his family's daily needs, and appellant was a "very hard worker." These witnesses further testified that they would have asked the jurors to show appellant

mercy because he was a great father and friend.

In addition to these affidavits, appellant attached an affidavit from his trial counsel, in which his trial counsel conceded that he only called one witness to testify on appellant's behalf during the punishment phase. Appellant's trial counsel further stated that although he knew that there were six to ten other people present in the trial court and available to testify on the day of the punishment hearing, he neither interviewed nor called these additional witnesses to testify because of his concern that they would be cross-examined by the State about appellant's criminal history. However, in this affidavit, appellant's trial counsel called into question his own decision-making with regard to his failure to call or even interview these other witnesses. Appellant's trial counsel testified,

> Because the State could have cross-examined [Tammy] Walker in this regard when she testified, but did not, and because the jury was made aware of [appellant's] prior convictions when he pled "true" to them, and given the importance of presenting mitigating evidence on [appellant's] behalf and humanizing him in the eyes of the jury, I believe there was no downside to presenting these additional punishment witnesses. I believe that it was critical for the defense to have presented these additional witnesses in mitigation of punishment and to humanize [appellant] in the eyes of the jury by showing them that these people, his friends and relatives, cared deeply about him. The testimony of these witnesses was essential if jurors were to seriously consider my request that they consider the low end of the punishment range. I believe that my decision not to call these additional punishment witnesses who were available was not based on reasonable trial strategy.

> Moreover, in addition to those six to ten people who were in the courtroom and available to testify, there were at least another dozen or so people *whom I neither interviewed nor called whom I knew were also available to testify on [appellant's] behalf at the punishment stage.*

> I believe that my failure to call those people who were in the courtroom and available to testify as well as my failure to interview and call those other witnesses of whom I am now aware to also testify at the punishment stage of [appellant's] trial contributed to the jury's assessment of a 70–year prison term.

(Emphasis added).

At the motion for new trial hearing, the State presented another affidavit from appellant's trial counsel, in which he offered testimony that contradicted the testimony in his first affidavit. In this second affidavit, appellant's trial counsel stated that he "want[ed] to elaborate on his decision not to call additional witnesses." He further stated that he decided not to call additional witnesses "because it would have been cumulative" of Walker's testimony and he "felt [Walker's testimony] was all that was necessary to help [appellant's] case." He further noted that the additional witnesses would have been asked about appellant's previous conviction for the same offense for which he was sentenced to 50 years, and he did not "feel this would have assisted [appellant's] case."

 The decision whether to present witnesses is largely a matter of trial strategy. *Shanklin v. State,* 190 S.W.3d 154, 164 (Tex.App.-Houston [1st Dist.] 2005, pet. dism'd). "Moreover, an attorney's decision not to present particular witnesses at the punishment stage may be a strategically sound decision if the attorney bases it on a determination that the

testimony of the witnesses may be harmful, rather than helpful, to the defendant." *Id.* (citing *Weisinger v. State,* 775 S.W.2d 424, 427 (Tex.App.-Houston [14th Dist.] 1989, pet. ref'd)). "However, a failure to uncover and present mitigating evidence cannot be justified as a tactical decision when defense counsel has not conducted a thorough investigation of the defendant's background." *Id.* (citing *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Rivera v. State,* 123 S.W.3d 21, 31 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd)). Counsel is ineffective when he fails to investigate and interview potential punishment witnesses, despite their availability and willingness to testify on appellant's behalf, and counsel can only make a reasonable decision to forgo presentation of mitigating evidence after evaluating available testimony and determining it would not be helpful. *Milburn v. State,* 15 S.W.3d 267, 270 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd).

 Here, appellant provided affidavits from over twenty witnesses, including appellant's mother, relatives, and neighbors, who were ready and willing to testify on appellant's behalf at the punishment hearing, but were never contacted by appellant's trial counsel. Significantly, appellant's trial counsel's first affidavit establishes that he did not even interview these witnesses, let alone present their testimony at the punishment hearing. This fact, which was not contradicted by appellant's trial counsel's second affidavit, necessarily defeats counsel's subsequent representation that the testimony of these additional witnesses would have been merely cumulative since, without conducting any sort of investigation into their testimony, he could not know whether the testimony was cumulative or not. Moreover, we note, as counsel admits in his first affidavit, the jurors were already aware of appellant's

prior 50–year sentence. As counsel conceded in his first affidavit, the importance of humanizing appellant to the jury outweighed the fact that the State could have had each of the witnesses acknowledge appellant's prior felony conviction. We conclude that counsel's failure to investigate and call additional punishment witnesses amounted to deficient performance. *See Shanklin,* 190 S.W.3d at 165.

 We must now determine the prejudicial impact of defense counsel's deficient performance under the second prong of *Strickland,* specifically whether there is a reasonable probability that the jury's assessment of punishment in this case would have been less severe in the absence of defense counsel's deficient performance. *Id.* (citing *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068). Here, we note that although appellant's trial counsel presented Walker's testimony, it was brief and lacking in the detail and information that the additional witnesses would have offered. Even appellant's trial counsel stated, in his closing argument, that, "None of us really know [appellant]. You don't know [appellant]. I don't know [appellant]." Interestingly, appellant's trial counsel went on to state, "The people that [sic] know [appellant] are all out here, his family and friends. He's got a lot of support. They're here because they think he's a good person. They're here because they think his life can be salvaged to a degree . . . ." And, yet, appellant's trial counsel failed to interview and call these witnesses who averred that they were ready, willing, and able to testify on appellant's behalf.

At the conclusion of the punishment hearing, after Appellant's trial counsel admitted that neither he nor the jurors really knew appellant, he requested a sentence of 5 to 10 years. The State requested that the jury return a sentence exceeding the

50–year sentence appellant had previously received for his prior felony conviction. The jury returned a sentence of 70 years, at the high end of the applicable range of 5 to 99 years and higher than the 50 years suggested by the State as an appropriate starting point for appellant's punishment. As appellant's trial counsel recognized in his first affidavit, he believed the testimony from appellant's additional punishment witnesses was critical to humanize appellant for mitigation purposes and was essential in order for the jurors to seriously consider his request for the low end of the punishment range.

We conclude that a reasonable probability exists that appellant's sentence would have been less severe had the jury balanced the mitigating testimony from additional witnesses. Thus, appellant has shown that he was actually and substantially prejudiced by his defense counsel's failure to seek out and present mitigating character evidence from these witnesses. *See id.; Milburn*, 15 S.W.3d at 271. Accordingly, we hold that appellant received ineffective assistance in the punishment phase of trial.

We sustain appellant's fifth issue.

### Conclusion

We reverse the portion of the judgment imposing punishment, affirm the judgment in all other respects, and remand the cause for a new punishment hearing.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

The majority erroneously concludes that the evidence presented by the State to the jury below is legally sufficient to support the conviction of appellant, Brandon Kirk Lair, of the offense of possession of a controlled substance, namely methylenedioxy methamphetamine (commonly referred to as "MDMA" or "ecstasy"), weighing between 4 and 400 grams.[1]

The majority's decision and the reasoning in its opinion is in contradiction of well-settled law and our sound application of the links rule in *Roberson v. State*, 80 S.W.3d 730, 735 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd). The majority, albeit unwittingly, significantly erodes the protection that the links rule affords bystanders from conviction based solely upon fortuitous proximity to another's contraband. *See Poindexter v. State*, 153 S.W.3d 402, 406 (Tex.Crim.App.2005). Accordingly, I respectfully dissent.

### Factual Background

Federal Bureau of Investigation Special Agent John Chiue, who was working on an organized crime task force with officers from the Houston Police Department, testified that he had received information that a strip shopping center, which contained a pool hall and bar, was a "hot spot" for criminal activity. On September 21, 2006, at 9:00 p.m., he conducted surveillance at the shopping center, and, as he sat in his unmarked car in the shopping center parking lot, Chiue saw an Asian male, later identified as Son Hoang, park a green Honda in the space next to Chiue's car.

Agent Chiue explained that he then saw Hoang exit the Honda and "he had a sandwich, kind of like a brown sack, sandwich sack, and he walked over to a vehicle, which was in the parking lot." The sack was "wadded up." Chiue, who had to look behind from where he was positioned, saw

---

1. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.103(a)(1) (Vernon Supp.2007), 481.116(d) (Vernon 2003).

Hoang approach two black males, later identified as appellant and Triston Davis, who had exited a red Dodge Magnum, which was parked about six car lengths away from Chiue's car. Although Chiue's view was "partially blocked" at this point, Chiue saw all three men enter the Dodge. After "approximately 30 seconds," Chiue saw Hoang exit the Dodge "from the backseat" and return to his Honda "empty handed." The men in the Dodge then drove away. A "short time later," another Asian male came out of the pool hall and entered Hoang's Honda. Chiue, who was parked right next to them, then saw the second Asian male who had entered Hoang's Honda counting "paper money."

Given his observations, Agent Chiue suspected that a narcotics transaction may have occurred because Hoang had been carrying the brown sandwich sack "wadded up" and was not carrying the sack as one might usually carry a sandwich. In Chiue's opinion, this conduct was consistent with a "hand-to-hand drug transaction." He radioed Houston Police Sergeant Michael Landry, who was working with Chiue, and told him that a narcotics transaction might have occurred.

On cross-examination, Agent Chiue agreed that his surveillance was random, he had never heard of appellant, Davis, or Hoang, and he did not see what happened inside the Dodge. He conceded that he did not see anything change hands while the three men were in the Dodge. Chiue did not see appellant "touch" or "look inside" the brown sack, hand over any money, act nervous, drive in a dangerous manner, or use a cellular telephone or beeper. He also did not know where the money that he saw the second Asian male count in Hoang's Honda actually came from. Specifically, Chiue conceded that the money could have come from the pool hall and that he could not testify that the money

came from the Dodge. He also admitted that "anything" could have been delivered in the brown sandwich sack and that the delivery of the sack, by itself, could be consistent with both innocent and criminal activity.

Sergeant Landry testified that, on the night in question, he was parked one block north of the parking lot when he saw the Dodge, occupied by two black males, pull into the center's parking lot. He received a radio communication from Agent Chiue about what was happening in the parking lot, and, when the Dodge left the parking lot, Landry and other police officers followed it for ten to fifteen minutes. After the driver of the Dodge committed a traffic violation, officers in a marked patrol car stopped the Dodge.

When the police officers asked appellant, who was the driver of the Dodge, to get out of the car, appellant "immediately" complied with the officers' instructions, and they placed appellant in the rear of their patrol car. On the other hand, the officers had to ask Davis, who was the passenger in the Dodge, "several times" to exit the car before he complied. Sergeant Landry noted that Davis was "very nervous," and, as Davis got out of the Dodge, "his elbow hit the console," which was between the bucket seats. The console then "clicked as if it had not been shut completely." Landry then opened the console and found a brown sandwich sack as described by Agent Chiue. Inside of the sack, Landry found three plastic bags containing blue pills, which were later confirmed to be 1000 ecstasy pills, weighing approximately 238 grams.

Contrary to Agent Chiue's testimony, Sergeant Landry, on cross-examination, testified that it was his understanding, based on Chiue's radio communications to him, that Chiue did not see Hoang enter the Dodge. Rather, Chiue saw Hoang

hand the brown sandwich sack "through the passenger's window" of the car in a transaction that lasted between "15 to 20 seconds."

Sergeant Landry conceded that he did not know whether appellant or Davis knew Hoang before their transaction, appellant was not driving dangerously, and Landry did not believe that appellant or Davis knew that they were being followed by police officers. He further agreed that when the officer in the patrol car activated his emergency lights, appellant pulled over, followed the officers' instructions, did not appear to be under the influence of any narcotics, did not attempt to flee, and "promptly" and "courteously" complied with the officers' instructions to get out of the car. Landry further conceded that, compared to Davis, appellant appeared relaxed. Landry did not see appellant make any furtive movements, put his hands or anything in the console, or touch the brown sandwich sack. Moreover, although Hoang's fingerprints were found on the plastic bags inside the sack, appellant's fingerprints were not found on the plastic bags. Landry also agreed that ecstasy does not have a distinctive odor. Although appellant had one cellular telephone, he did not have any weapons, beepers, or a large amount of cash.

Sergeant Landry also conceded that he had not heard anything to prove that appellant had participated in any negotiations with Hoang or that appellant had even touched or looked inside of the brown sandwich sack that contained the narcotics. When asked if he had any reason to believe that appellant knew what was in the sack, Landry responded that appellant was the owner of the Dodge and that he would think that appellant "would know what was coming into his vehicle." Landry agreed that the Dodge was registered to another person, but maintained that, because appellant had care and custody of the car, appellant was the owner of the car at that point in time.

### Standard of Review

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex.Crim.App.2005). The Texas Supreme Court has explained the well-settled law that we must sustain a legal sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex.2005). Evidence does not exceed a scintilla if it does no more than create a mere surmise[2] or suspicion[3] that a fact exists. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004). If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822. However, if the undisputed facts allow only one logical inference, neither jurors nor the reviewing court may disregard those

**2.** "Surmise" is defined as "a supposition that something may be true, even though there is no evidence to confirm it." THE NEW OXFORD AMERICAN DICTIONARY 1710 (2001).

**3.** "Suspicion" is defined as "a feeling or thought that something is possible, likely, or true." *Id.* at 1712.

facts. *Id.; see Evans v. State*, 202 S.W.3d 158, 162–63 (Tex.Crim.App.2006).

In conducting a legal sufficiency review, an appellate court must be mindful that the trier of fact is the sole judge of the weight and credibility of the evidence. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000). Thus, when performing the review, the court may not reevaluate the weight and credibility of the evidence and substitute its judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999). The court must resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim.App.2000).

## Legal Sufficiency

In his first point of error, appellant argues that the evidence is legally insufficient to support his conviction because the State presented no evidence that he exercised care, custody, control, or management over the narcotics or that he knew the brown sandwich sack contained narcotics.[4]

A person commits the offense of possession of a controlled substance in an amount of more than 4 grams but less than 400 grams, if he knowingly or intentionally possesses the controlled substance in the prescribed amount, by aggregate weight, including adulterants or dilutants. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.103(a)(1) (Vernon Supp.2007), 481.116(d) (Vernon 2003).

"Possession" means "actual care, custody, control, or management." TEX. PENAL CODE ANN. § 1.07(39) (Vernon Supp.2007). Moreover, possession is a voluntary act "if the possessor knowingly obtains or re-

ceives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control." *Id.* § 6.01(b) (Vernon 2003). Accordingly, in a possession of a controlled substance prosecution, the State must prove that (1) the accused exercised control, management, or care over the substance, and (2) the accused knew that the matter possessed was a controlled substance. *Evans*, 202 S.W.3d at 161.

Here, although appellant was the driver of the Dodge in which the brown sandwich sack containing the narcotics was found, he was not in exclusive possession of the car. Davis was also present in the Dodge as a passenger, also seated next to the console containing the brown sack, and actually contacted the console upon exiting the car. In such circumstances, this Court has explained,

> When, as here, the accused is not in exclusive possession of the place where contraband is found, there must be additional independent facts and circumstances which affirmatively link the [accused] to the contraband *in such a way that it can be concluded that the accused had knowledge of the contraband and exercised control over it.* ... An affirmative link [is one that] *generates a reasonable inference that the accused knew of the contraband's existence and exercised control over it.* ... Proof of an affirmative link between the accused and the contraband is mainly needed to establish knowledge or intent.

*Roberson*, 80 S.W.3d at 735 (citations omitted) (emphasis added). In short, "[w]hether this evidence is direct or circumstantial, 'it must establish, to the requisite level of

---

4. Appellant notes that the trial court, after the State had presented the same evidence in the trial of his codefendant, Davis, granted Davis's motion for instructed verdict "on facts even stronger than those in appellant's case." *State v. Davis*, No. 1105078, in the 262nd District Court, Harris County, Texas, the Honorable Mary Bacon presiding.

confidence, that the accused's connection with the drug was more than just fortuitous.'" *Poindexter*, 153 S.W.3d at 405–06. This "is the whole" of the so-called "links" rule. *Id.* at 406.

The Texas Court of Criminal Appeals has explained that the purpose of the links rule is to "protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's [narcotics]." *Id.* The links rule "simply restates the common-sense notion that a person-such as a father, son, spouse, roommate, or friend-may jointly possess property like a house *but not necessarily jointly possess the contraband found in that house.*" *Id.* (emphasis added). Thus, "[w]hen the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband." *Id.*

Texas courts have identified "many nonexhaustive factors" that may demonstrate a link to contraband. *Roberson*, 80 S.W.3d at 735. These factors constitute "a shorthand way of expressing what must be proven to establish that [narcotics] were possessed knowingly." *Id.* The number of linking factors present is not as important as the "logical force" they create to prove that an offense was committed. *Id.* These links include (1) the accused's presence when a search is conducted, (2) whether the narcotics were in plain view, (3) the accused's proximity to and the accessibility of the narcotics, (4) whether the accused was under the influence of narcotics when arrested, (5) whether the accused possessed other contraband or narcotics when arrested, (6) whether the accused made incriminating statements when arrested, (7) whether the accused attempted to flee, (8) whether the accused made furtive gestures, (9) whether there was an odor of contraband or narcotics, (10) whether other contraband or narcotic paraphernalia was present, (11) whether the accused owned or had the right to possess the place where the narcotics were found, (12) whether the place in which the narcotics were found was enclosed, (13) whether the accused was found with a large amount of cash, and (14) whether the conduct of the accused indicated a consciousness of guilt. *Evans*, 202 S.W.3d at 162 n. 12.

In *Roberson*, we applied these factors against a defendant who was the driver of a car containing two passengers and several grams of cocaine, and we held that the evidence was legally insufficient to support the defendant's conviction for possession of cocaine. 80 S.W.3d at 742. We noted that, "[i]n summary, [Roberson] was the driver of a car containing two passengers; 24 grams of cocaine were later discovered in and near the car; the drugs were found near where [Roberson's] cousin, Lee, had previously been seated; and the jury could have found that [Roberson] displayed a general consciousness of guilt after his arrest when he disassociated himself from [the second passenger]." *Id.* at 741. We explained that, although the facts that the defendant "was the driver of a car later found to contain cocaine" and his relationship to Lee and attempted disassociation from the second passenger were "suspicious," such "[p]roof amounting only to strong suspicion or mere probability will not suffice." *Id.* at 742. We emphasized,

> There is nothing else to link [Roberson] to the cocaine. He was not under the influence of drugs. In fact, no drugs of any kind, drug paraphernalia, or money was found on his person or near the driver's seat. There was no drug odor in the car. Appellant was cooperative throughout the stop and made no furtive gestures. The cocaine was not found

until almost twenty minutes had passed since appellant got out of the car at [the Trooper's] request, while Lee and [the second passenger] remained inside during much of that time. No statements were made by any of the three connecting [Roberson] to the drugs.

*Id.* Accordingly, we concluded,

In short, the State has presented a collection of potential linking factors, each of which might raise suspicion but is insufficient on its own to provide the required ... link between appellant and the cocaine. These factors, even when viewed together in the light most favorable to the verdict, do not create the logical force necessary to allow a rational juror to find, beyond a reasonable doubt, that appellant had knowledge of the presence of cocaine.

*Id.*

In the instant case, the State asserts that the narcotics were "(1) conveniently accessible to the appellant, (2) in a vehicle under the care, custody[,] and control of the appellant, (3) found in the console next to appellant, and (4) found secreted in an enclosed space." Without citation to any supporting authority,[5] the State thus concludes that "the jury could [have] reasonably infer[red] that appellant exercised control, management, or care over the substance and knew the matter possessed was contraband."

The majority, likewise emphasizes,

[T]he State presented evidence that the narcotics, located in the center console, were conveniently accessible to appellant and that appellant, as the driver, owned or had the right to possess the car where the narcotics were found. The State also presented evidence that, prior to Davis's exiting the car, the cen-

ter console in which the narcotics were located *was not completely closed, which, coupled with the evidence of Hoang's suspicious behavior, gives rise to a reasonable inference that the sack in which the narcotics were located had been visible before appellant and Davis exited the Dodge.* The fact that the narcotics were secured in the console, therefore, constitutes evidence of an alternative link—that the narcotics were secreted in an enclosed space.

(Emphasis added). The majority adds,

[T]he State presented evidence that appellant and Davis together greeted Hoang as he approached them in the parking lot, all three men got into the car being driven by appellant, thus concealing their actions from plain view, all three men remained in the car for 30 seconds, and Hoang then exited the car empty-handed and without the sack, *causing Chiue to conclude he had observed a hand-to-hand drug transaction.*

(Emphasis added). The majority concludes that "these facts, in combination, provide sufficient logical force to establish appellant *exercised control over the narcotics* and his contact was more than fortuitous." (Emphasis added). This conclusion, like the State's conclusion, is based upon assumptions that merely raise suspicion.

Here, the bottom line is that, as conceded by the State during oral argument, there is absolutely no evidence in the record that appellant ever looked inside of the brown sandwich sack, ever touched the sack, or had anything to do with placing the sack into the car's console. Agent Chiue simply was not in a position to hear anything or see what happened inside of the Dodge. Thus, Chiue could not testify

**5.** Although the State was invited at oral argument to provide post-submission briefing to discuss any case law supporting its position, the State has not done so.

that Hoang gave the sack to appellant, nor did Chiue hear appellant say anything to prove that appellant knew that the sack contained narcotics.

Yet, the State and the majority conclude that the facts of this case establish that appellant knowingly exercised control over the narcotics in the brown sandwich sack. This conclusion stands in direct contradiction to *Roberson,* in which we held that such "[p]roof amounting only to strong suspicion or mere probability will not suffice." 80 S.W.3d at 742. Even if Agent Chiue may have had reasonable suspicion to temporarily detain appellant, Davis, and Hoang, this does not mean that the State's evidence is legally sufficient to prove that appellant knowingly exercised control over the narcotics in the sack.

When objectively considered, the State has presented only two factors that could possibly link appellant to the narcotics: (1) appellant had possession of the car in which the narcotics were found, and (2) appellant, as the driver of the car, was in very close proximity to and had access to the console in which the brown sandwich sack containing the narcotics was found. However, as we stated in *Roberson,* without exclusive control of the car, the mere fact that "a defendant was driving a vehicle containing narcotics," by itself, is not legally sufficient to sustain a conviction for possession of the narcotics. *Id.* at 736. Thus, without any other links to the narcotics, the logical force of this link is undermined.

In regard to the fact that appellant, as the driver, was close to and had access to the console in which the brown sandwich sack containing the narcotics was found, the logical force of this link is undermined by the fact that the State did not prove when the narcotics were placed in the console. One might suspect that appellant placed the narcotics in the console. How-

ever, as Sergeant Landry testified, after appellant "immediately" complied with the instructions of police officers to exit the car, Davis was alone in the car with the narcotics. Here, the following exchange between the State and Landry occurred:

[State]: The vehicle stops and what do you [do] next?

[Landry]: We asked the driver to get out of the vehicle and then we asked the passenger to get out of the vehicle.

[State]: Did they comply?

[Landry]: The passenger—the driver immediately got out of the vehicle and was placed in the rear of the patrol car. *The passenger was asked to get out of the car several times before he would comply.*

(Emphasis added). On cross-examination, Landry elaborated,

[Defense counsel]: And then when you asked [appellant] to get out of the car . . ., he did that promptly and he did it courteously?

[Landry]: Yes, sir.

[Defense counsel]: And you said he appeared to be relaxed?

[Landry]: Compared to [Davis], yes.

[Defense counsel]: He made no furtive movements that you saw?

[Landry]: That I saw, no, sir.

[Defense counsel]: He never attempted to put his hands or anything in that console, right?

[Landry]: Not that I saw.

[Defense counsel]: You never saw him touching that brown paper bag, correct?

[Landry]: No, sir.

In stark contrast to appellant, the police officers had to ask a "very nervous" Davis several times to exit the Dodge, and, before he finally did, Davis's "elbow hit the

console," and it "clicked as if it had not been shut completely." This is an undisputed fact that the jury was not entitled to ignore. Because Davis was alone in the Dodge after appellant had gotten out of the Dodge and was then placed into the patrol car, it cannot logically be inferred that the brown sandwich sack containing the narcotics was in the console when appellant was in the Dodge. Moreover, the fact that Davis made a furtive gesture, apparently to conceal the sack, by closing the console, does not, as asserted by the majority, support a logical inference that "the sack in which the narcotics were located had been visible before appellant and Davis exited the Dodge." More importantly, there is still no evidence in the record that appellant knew what was inside the sack. There is also no evidence that would support a logical inference that appellant "secreted" the narcotics "in an enclosed space." The only logical inference supported by the undisputed evidence is that Davis, not appellant, concealed the brown sandwich sack in the console of the Dodge after appellant had exited the Dodge and was placed in the patrol car.

Nevertheless, the State contends that appellant's connection with the narcotics "was more than fortuitous." In its brief, the State asserts that,

> Agent Chiue *actually observed the drugs being delivered* into the passenger compartment of the vehicle occupied by the appellant along with his friend and shortly thereafter, *observed the Asian male involved in that delivery counting a large wad of paper money in his car.* The paper bag was secreted in the console located next to the appellant who was the driver. The jury could reasonably infer from these circumstances that the appellant could not have escaped having knowledge of the drug transaction that occurred within the small enclosed confines of the passenger compartment and in his presence, and that he clearly exercised care, custody, and control over the contraband when he either secreted the drugs in the console or allowed the drugs to be secreted.

(Emphasis added). First, Agent Chiue did not testify that he "actually" saw Hoang deliver narcotics into the passenger compartment of the Dodge. If he had, that would establish Davis's possession, not appellant's. In fact, Chiue testified that he could not see what had happened inside of the car. He did testify that he saw Hoang, carrying a "wadded up" brown sandwich sack, enter the Dodge with appellant and Davis and then saw Hoang exit the Dodge "empty handed" after approximately 30 seconds.

Second, Agent Chiue did not "observe" Hoang "counting a large wad of paper money in his car." On direct examination, Chiue did testify as follows:

> [Chiue]: Another Asian male gets in the vehicle, they're parked right next to me, as I was looking down on them, they were counting money.
>
> [The State]: Could you see denominations of the bills?
>
> [Chiue]: It was paper money. They were counting it just like you count paper money.
>
> [The State]: *How big of a wad of money are we talking about?*
>
> [Chiue]: *I couldn't tell you;* but they were—they were just counting it like money.

(Emphasis added). On cross-examination, Chiue clarified his previous testimony,

> [Defense counsel]: And then another Asian male came out of the pool hall?
>
> [Chiue]: Correct.
>
> [Defense counsel]: Got into the Accord?
>
> [Chiue]: Correct.

[Defense counsel]: And at that time you saw some money being counted?

[Chiue]: Correct.

[Defense counsel]: Who was counting the money?

[Chiue]: *The second male that came out of the pool hall.*

[Defense counsel]: All right. So you don't know if the money came from Mr. Hoang, the person that approached the red [Dodge], or you don't know if the money came from the person in the pool hall, right?

[Chiue]: *I don't know.*

(Emphasis added). Thus, the State's argument is based, in part, on false premises.

Third, even assuming that Agent Chiue actually saw Hoang "counting a large wad of money" in his car after handing off the brown paper sack in the Dodge, this would, at best, support Chiue's suspicion that Hoang had engaged in a narcotics transaction. Given the presence of Davis in the Dodge, the State's evidence does not prove that Hoang actually sold the narcotics to appellant. Nor does it prove that appellant exercised "actual care, custody, control, or management" over the narcotics. Nor does it prove that appellant even had any knowledge of what was inside the brown sandwich sack.

Finally, as conceded by the State during oral argument, Agent Chiue did not see what happened in the Dodge and Chiue did not hear any word spoken between Hoang and appellant and Davis during their 30 seconds together. As further conceded by the State, it presented no evidence that appellant ever touched the brown sandwich sack, looked into the sack, or had anything to do with placing the sack into the car's console.

In support of its holding that the evidence in this case is legally sufficient to show that appellant knowingly exercised care, custody, control, and management over the narcotics in the brown sandwich sack, the majority relies, parenthetically, on *Evans,* 202 S.W.3d at 166; *Poindexter,* 153 S.W.3d at 405; and *Robinson v. State,* 174 S.W.3d 320, 326 (Tex.App.-Houston [1st Dist.] 2005, pet. ref'd). These cases are not applicable here.

The majority first cites *Robinson* for "affirming [the] possession conviction of [a] front-seat passenger in [a] truck where [the] cocaine was located in [a] factory compartment in [the] back wall of [the] truck, and noting that [the] cocaine was within [the] vicinity and easily accessible to [the] passenger." *See* 174 S.W.3d at 326. However, there was far more significant evidence linking Robinson to the contraband. We emphasized,

> In summary, [Robinson] was a passenger in a truck found to be transporting two kilos of cocaine worth more than one million dollars. The cocaine was located in an enclosed, unlocked space in the back of a truck, concealed under a shirt. [Robinson] was traveling from Houston, a major cocaine distribution point, and claimed to have been there two days— an amount of time that conflicted with [the driver's] account—but carried none of the necessities for an overnight stay, such as a toothbrush or fresh clothing. Neither [Robinson] nor [the driver] carried any identification; [the driver] was not a licensed driver, but stated that [Robinson] was in fact a licensed driver and was supposed to be driving. [The driver] gave conflicting accounts as to ownership of the truck, and he and [Robinson] gave conflicting accounts regarding their trip to Houston. Moreover, a magazine for a semi-automatic handgun was found in plain view on the console between [the driver] and [Robinson], and, when [the trooper] asked

where the weapon was, [Robinson] reached toward a loaded handgun concealed by a shirt on the floor of the truck. The jury could have found that the handgun was for the protection of the cocaine.

*Id.* at 329. The links established in *Robinson* and their logical force taken together serve to show precisely how weak the State's evidence is in the instant case, not that appellant knowingly "exercised control over the narcotics and his contact was more than fortuitous."

The majority next cites *Poindexter* for the proposition that "[t]he mere fact that a person other than the accused might have joint possession of the premises does not require the State to prove that the defendant had sole possession of the contraband." *See* 153 S.W.3d at 412. This is true, but it certainly does not contradict appellant's point, which is that the State, in such a circumstance, must present sufficient evidence to link such an accused to the contraband. In *Poindexter*, the State presented evidence that after a confidential informant purchased cocaine from Poindexter at a house, police officers executed a search warrant at the house to seize narcotics. *Id.* at 404. Although another person had been seen in the house and Poindexter was not present when the officers executed the warrant, the State presented unobjected to hearsay evidence from one of the officers that the confidential informant had told the officers that Poindexter possessed and sold cocaine and where Poindexter hid the cocaine in his house. *Id.* at 407–11. Moreover, the cocaine was found in plain view and "recovered from a hidden location accessible only to one who exercised control over the house." *Id.* at 409. Poindexter resided at the house, the cocaine was accessible to Poindexter, and the officers found not only the cocaine, but manufacturing and packaging materials, including glass tubes or

vials used to make crack cocaine, razors, baggies, and a scale. *Id.* at 411–12. The Texas Court of Criminal Appeals concluded that the relative probative value of all of the evidence, "including the hearsay evidence," was legally sufficient to show that Poindexter "exercised care, custody, control, and management over the contraband" and "knew" it was contraband. *Id.* at 412. Here, of course, the State did not present evidence from anyone to establish that appellant had such direct control over the brown sandwich bag or that he even knew what was inside of it.

Finally, the majority relies on and quotes *Evans* for the proposition that the circumstantial evidence here, as in *Evans,* constitutes "amply sufficient evidence connecting appellant to the actual care, custody, or control of narcotics." *See* 202 S.W.3d at 166. However, the Texas Court of Criminal Appeals summarized the case against Evans as follows:

The State argues that the single most important link or connection between [Evans] and ... fourteen grams of cocaine rocks is *the simple fact that he was sitting directly in front of them.* They were within arm's reach; the coffee table was less than a foot away. This evidence constitutes two extremely strong "presence" and "proximity" links. [Evans] was not merely present in a house with drugs cached away somewhere, they were right under his nose. The drugs were *in plain view*—a third link. He was *alone in the house*—a fourth link. *He immediately admitted that he knew why the police had walked in the door—"Drugs."* That is a fifth link. He received mail at 923 Lombrano, thus raising a reasonable inference that he lived there, which, in turn, raises a reasonable inference that he had actual care, custody, and control of items found in plain view on the coffee table.

This is a sixth link. He had $160 in twenties in his pocket, but he was apparently unemployed. This is a seventh, albeit weak, link. The State argues that the sum total of this circumstantial evidence is sufficient to support a rational jury's finding, beyond a reasonable doubt, that appellant exercised actual care, custody, control, or management of the fourteen grams of cocaine on the coffee table. We agree.

*Evans,* 202 S.W.3d at 163 (emphasis added). Clearly, the strength of the links in *Evans* are in no way comparable to the purported links in the instant case. *Evans* does not support the majority's conclusion that the evidence here is legally sufficient to support appellant's conviction.

In fact, each case relied upon by the majority to support its conclusion—*Robinson, Poindexter,* and *Evans*—actually undermines its conclusion. None of the strong and significant links present in those cases are present here. Here, in contrast to *Robinson,* the State did not present evidence of facts inconsistent with any statement of appellant. Appellant and Davis did not give conflicting stories to Sergeant Landry about their travel plans or ownership of the car in question. Nor did appellant have a firearm in the Dodge "for the protection" of narcotics. In contrast to *Poindexter,* the State, here, did not present evidence from a confidential informant that appellant hid narcotics in a specific location. Finally, in contrast to *Evans,* the State presented no evidence that narcotics were found in plain view of appellant while he was "sitting directly in front of them."

As we noted in *Roberson,* "possession means more than being where the action is." 80 S.W.3d at 742. Moreover, "[p]roof amounting only to strong suspicion or mere probability will not suffice." *Id.* Here, appellant was the driver of a car found to contain narcotics in the console of the car near the driver's seat. However, because appellant did not have exclusive control over the car, this fact merely raises suspicion. *See id.* As in *Roberson,* there is nothing else to link appellant to the narcotics. The narcotics were not found in plain view where one would know of their presence. Appellant was not under the influence of narcotics. No narcotics of any kind, drug paraphernalia, or money was found on his person. There was no drug odor in the car. Appellant was cooperative throughout the stop and made no furtive gestures. He did not engage in conduct indicating a consciousness of guilt and did not attempt to conceal or destroy evidence. Appellant did not attempt to flee or escape and made no incriminating statements connecting himself to the narcotics. Moreover, appellant was not present in the Dodge when the narcotics were found after Davis had hit the console of the car with his elbow as if to close the console.

As in *Roberson,* the State has presented some "potential linking factors" which "might raise suspicion" but do not have the logical force necessary to actually link appellant to the narcotics. *See id.* Even when viewed together in the light most favorable to the verdict, the factors relied upon by the State "do not create the logical force necessary to allow a rational juror to find, beyond a reasonable doubt," that appellant exercised actual care, custody, control, or management over the narcotics or even knew that the brown sandwich sack contained narcotics. *See id.*

Accordingly, I would hold that the evidence is legally insufficient to support appellant's conviction of the offense of possession of a controlled substance. I would sustain appellant's first issue and reverse the judgment of the trial court and render a judgment of acquittal.

The majority's conclusion to the contrary is in direct contradiction of the well-settled law and our holding in *Roberson.* Unwittingly, the majority's opinion waters down the links rule to the point that it is nearly meaningless and significantly erodes the protection that the links rule affords bystanders "from conviction based solely upon ... fortuitous proximity to someone else's [narcotics]." *Poindexter,* 153 S.W.3d at 406.