Opinion issued July 23, 2009







          





In The
Court of Appeals
For The
First District of Texas




NO. 01-07-00672-CR
____________

QUINTIN FERNANDEZ WIGGINS, Appellant

V.

THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the 338th District Court
Harris County, Texas
Trial Court Cause No. 1107008
 

 
 
MEMORANDUM OPINION ON REHEARING
          Appellant, Quintin Fernandez Wiggins, has filed a motion for rehearing. We
deny appellant’s motion for rehearing. See Tex. R. App. P. 49.3. We withdraw our
March 26, 2009 opinion, substitute this opinion in its place, and vacate our March 26,
2009 judgment.A jury found appellant guilty of the felony offense of misapplication of
fiduciary property


 and assessed his punishment at confinement for ten years. In
seven issues, appellant contends that the evidence is legally and factually insufficient
to support his conviction, the trial court erred in denying his motion to quash the
indictment, and he was denied effective assistance of counsel by one of his trial
attorneys based upon an actual conflict of interest and by both of “his trial attorneys’
failure to conduct a factual investigation.”
          We affirm.
Factual Background
          Terry Holderman, the Director of Audits of Texas Southern University
(“TSU”), testified that appellant, as TSU Senior Vice President for Finance, “was in
charge of the finances for the university.” Appellant, a certified public accountant
with a master’s degree in business, had previously served on the “task force that
created policies and procedures on procurement at [TSU].” TSU’s procurement
policies dictated that in order for a department or person to purchase goods or
services with TSU funds, the department or person had to identify the TSU account
number from which the funds would be allocated. Each department had an
accounting organization number assigned to it for its purchases. These accounting
organization numbers allowed Holderman to easily identify the expenditures of a
department or individual.
          Holderman further testified that in January 2006, George Williams, the
chairman of the TSU Board of Regents Audit and Finance Committee, asked him to
investigate purchases of furniture made by Priscilla Slade, TSU’s President, for her
house with TSU funds.


 Holderman discovered that Slade had spent approximately
$86,000 of TSU funds on furniture for her house. Because the purchases had been
made using TSU accounting “organization number 31001,” which identifies “general
institution activity,” instead of the TSU accounting organization numbers 10000 and
11001, which had been assigned to Slade’s office, the purchases would not “have
[been] found in an audit of [Slade’s] office.” Holderman also discovered that Slade
had used TSU funds, allocated out of organization number 31001, to pay
approximately $139,000 for landscaping at her house. The TSU Board of Regents
had not approved any of these expenditures.
          Having discovered Slade’s unauthorized use of TSU funds for personal
expenses, Holderman “went down to speak to [appellant]” because he controlled all
expenditures made from organization number 31001. Holderman told appellant that
he had uncovered approximately $139,000 of TSU funds spent on landscaping at “Dr.
Slade’s house that [had been] charged to the university” using accounting
organization number 31001. Appellant replied that “he didn’t know anything about
it, but it was an obvious error.” Appellant suggested to Holderman, “[We] can get
[TSU’s] money back from the [landscaping] vendor, and . . . [because] this was just
an error, we don’t have to get [the Board of Regents] involved.” Holderman left
appellant’s office, called Williams, and told him, “We [have] a bigger problem than
what you originally thought.”
          Belinda Griffin, chairperson of the TSU Board of Regents, testified that she
joined the board in 2003 and participated in the renegotiation of Slade’s employment
contract, which provided for an expense account for “university-related business . . .
not to exceed $50,000.” Griffin explained that TSU’s rules and regulations,
consistent with the Constitution and statutes of Texas, prohibit “the use of State
money or property for private purposes” and require that “State property be used only
for State Purposes.” Although Slade had the power to authorize purchases up to
$100,000, TSU’s rules and regulations required her to obtain approval from the Board
of Regents for any expenditure that had not been budgeted, was outside her contract,
or was for her personal benefit.
          In January 2006, Griffin visited Slade’s newly built house to “pick up two
handbags and a necklace” from Slade. When Griffin arrived, Slade gave her a tour
of the house. During the tour, Griffin commented “on how beautiful everything was,
[and Slade] said, ‘Oh, yeah, you know, some of these things were purchased by the
university.’” Slade informed Griffin that “the university [had] purchased this furniture
for the president’s home.” 
          Alice Rosemon, TSU’s Assistant Vice President for Procurement Services,
testified that she worked under appellant’s supervision, and in August 2005,
appellant, during a telephone call, told her that Slade was “out there picking out her
furniture for her new home.” Appellant then asked Rosemon, “Can we pay for this?” 
Rosemon reviewed past records and told appellant how TSU had handled purchases
of furniture for past presidents. Later that month, Billy Burnett, Slade’s assistant,



approached Rosemon in a parking lot after work and told her to keep the furniture
purchases “confidential” and that he would bring the invoices to Rosemon. When
Rosemon told Burnett that he should have Slade’s department fill out the paperwork, 
Burnett replied that Slade did not want her department involved in the paperwork. 
Appellant, seeing Rosemon and Burnett talking, approached them and “asked what
was going on.” Rosemon told him that “Slade wanted to keep the furniture
confidential . . . and didn’t want her department involved in doing the paperwork.” 
Appellant told her, “That’s fine.” 
          A few days later, Burnett delivered furniture invoices to Rosemon and told her
that Slade “only needed half to pay down a deposit.” So, Rosemon prepared two
requisitions: one for a deposit of $23,503.95 and the other for the remaining
$22,819.05. Burnett later brought in invoices for additional furniture purchases of
$40,144.30, which brought the total amount for the second requisition to $62,963.35. 
In order to process the requisition, Rosemon needed to know from which TSU fund
she should withdraw the money, so she asked appellant which “funding source . . .
[she should] use to pay for the furniture.” Appellant told her to use organization
number 31001 in the 9200 fund. Appellant then called Rhoda Daniels and told her
to transfer $175,000 into the 9200 fund. 
          In October 2005, Ron Butler, TSU’s Executive Director of Facilities and
Construction Services, presented Rosemon with an invoice for approximately
$10,000 for landscaping at Slade’s residence. Rosemon told appellant “that Ron
Butler had brought an invoice . . . for the landscaping at [Slade’s] house.” When she
asked if she should use the same funding that she had used for the furniture, appellant
told her, “Yes, that will be fine.” Two “modifications” to this requisition for
“additional landscaping services” brought the total amount for Slade’s landscaping
to $138,159.00. The payments for the landscaping were made with two checks, both
signed by appellant. Rosemon explained that before signing these checks, appellant
could have reviewed “all the [attached] documents to see what he’s authorizing
payment for.” The landscaping costs, like the furniture costs, were paid using
organization number 31001. In order to ensure that there were sufficient funds to pay
for Slade’s purchases, appellant sent an email to Adolphus Moore, TSU’s Senior Plan
Accountant,


 instructing him to transfer an additional $120,000 into the 9200 fund.



          In December 2005, Butler gave Rosemon a requisition for $5,790 “to encumber
funds for installation of [a] security wiring system for” Slade’s house. However,
Rosemon told Butler that she could not process the requisition because the funding
information had not been completed on the requisition. Butler went to talk to
appellant, and, a few minutes later, appellant called Rosemon and told her to use “the
same funding sources that [she] had used for the landscaping and for the furniture.” 
During her testimony, Rosemon identified a requisition, signed by appellant,
approving an additional $56,010 for various parts and installation of Slade’s security
system.
          In January 2005, Rosemon heard rumors circulating about Slade’s purchases. 
Appellant called Rosemon into his office and told her, “I’m going to stick to my story
that I don’t know anything about the furniture [and the landscaping].” In sum,
appellant had approved the expenditure of TSU funds totaling $286,426.30 for
Slade’s furniture, landscaping, and security system.
Sufficiency of the Evidence
          In his fourth and fifth issues, appellant argues that the evidence is legally and
factually insufficient to support his conviction because the State failed to prove that
he “committed the offense of misapplication of fiduciary property.” In his sixth and
seventh issues, he argues that the evidence is legally and factually insufficient to
support his conviction because he “never held any property pursuant to any
agreement.” (Emphasis added.)
          We review the legal sufficiency of the evidence by considering all of the
evidence in the light most favorable to the verdict to determine whether any rational
trier of fact could have found the essential elements of the offense beyond a
reasonable doubt. Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)
(citing Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct. 2781, 2788–89 (1979)). 
In doing so, we give deference to the responsibility of the fact-finder to fairly resolve
conflicts in testimony, to weigh evidence, and to draw reasonable inferences from the
facts. Id. However, our duty requires us to “ensure that the evidence presented
actually supports a conclusion that the defendant committed” the criminal offense of
which he is accused. Id. 
          In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if the proof of guilt is so
obviously weak as to undermine confidence in the jury’s determination, i.e., that the
verdict seems “clearly wrong and manifestly unjust,” or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006). We
note that a jury is in the best position to evaluate the credibility of witnesses, and we
afford due deference to the jury’s determinations. Marshall v. State, 210 S.W.3d 618,
625 (Tex. Crim. App. 2006). Although we should always be “mindful” that a jury is
in the best position to decide the facts and that we should not order a new trial simply
because we disagree with the verdict, it is “the very nature of a factual-sufficiency
review that . . . authorizes an appellate court, albeit to a very limited degree, to act in
the capacity of a so-called ‘thirteenth juror.’” Watson, 204 S.W.3d at 416–17. Thus,
when an appellate court is “able to say, with some objective basis in the record, that
the great weight and preponderance of the (albeit legally sufficient) evidence
contradicts the jury’s verdict[,] . . . it is justified in exercising its appellate fact
jurisdiction to order a new trial.” Id. at 417.
          An individual commits the offense of misapplication of fiduciary property “if
he intentionally, knowingly, or recklessly misapplies property he holds as a fiduciary
. . . in a manner that involves substantial risk of loss to the owner of the property or
to the person for whose benefit the property is held.” See Tex. Penal Code Ann.
§ 32.45(b) (Vernon Supp. 2008). A fiduciary misapplies property when he deals with
the property contrary to either “an agreement under which the fiduciary holds the
property” or “a law prescribing the custody or disposition of the property.” Tex.
Penal Code Ann. § 32.45(a)(2) (Vernon Supp. 2008). This offense is a first degree
felony when the “value of the property misapplied is $200,000 or more.” Id.
§ 32.45(c)(7) (Vernon Supp. 2008). Under the law of parties, a defendant may be
convicted of the offense of misapplication of fiduciary property if, acting with intent
to promote or assist the commission of the offense of misapplication of fiduciary
property, he solicits, encourages, directs, aids, or attempts to aid another person
committing the offense. See id. § 7.02(a)(2) (Vernon 2003), § 32.45. 
Knowledge of Expenditures
          In support of his argument that the evidence is legally insufficient to support
his conviction, appellant asserts that “there is no evidence [that he] intentionally,
knowingly, or recklessly allowed expenditures for purposes other than those allowed
by both University and State guidelines.” Appellant also asserts that “he believed that
all such expenditures [made by Slade] were for [u]niversity [p]urposes” and not “for
the benefit of Slade’s personal purposes.”
          Viewing the evidence in the light most favorable to the verdict, appellant,
TSU’s Vice President of Finance, knew that Slade’s expenditures were personal in
nature and unrelated to state purposes. Appellant told Rosemon that Slade was
“picking out furniture for her new home” and that she should comply with Slade’s
wish “to keep the furniture confidential.” (Emphasis added.) In regard to the
landscaping expenses, Rosemon told appellant that the landscaping expenses were
for Slade’s house. In regard to the security system, Butler told appellant that the
expenses “pertained to the security system at Slade’s house.” Nevertheless, appellant
told Rosemon to process the requisitions for these expenditures using a TSU
accounting organization number not applicable to Slade’s office so that the purchases
would be concealed from an audit of Slade’s office. Additionally, appellant’s
statement to Rosemon that he we was planning to “stick to [his] story that [he did not]
know anything about the furniture [and the landscaping]” supports a logical inference
that he knew that Slade’s purchases were for her personal use and were not allowed
by TSU’s guidelines. In sum, the evidence shows that a rational trier of fact could
have reasonably found that appellant knowingly aided Slade in misapplying TSU
funds for Slade’s personal purposes. Accordingly, we hold that the evidence is
legally sufficient to support the jury’s implied finding that appellant intentionally,
knowingly, or recklessly misapplied TSU’s property.
          In support of his argument that the evidence is factually insufficient to support
his conviction, appellant asserts that “there is no evidence [that appellant] had prior
knowledge of or involvement in any expenditures for the benefit of Slade’s personal
purchases” and that Slade, not appellant, “obligated [TSU] for the expenditures in
question.” He further asserts that the “testimony of both [Wanda] Pleasant and [Gita]
Bolt directly refute[d] any accusation that [he] misapplied TSU funds for the purchase
of furniture.”
          Viewing the evidence in a neutral light, both Pleasant and Bolt testified that
appellant had not “obligated [TSU] for the [e]xpenditures.” Nevertheless, as outlined
above, there is ample evidence that appellant knew that Slade used TSU funds for her
personal benefit and not for state purposes. Moreover, even if Slade, not appellant,
had obligated TSU for the expenditures in question, the evidence demonstrates that
appellant intentionally aided Slade by using a TSU accounting organization number
to conceal the purchases from an audit review, by transferring funds into an account
to pay for Slade’s purchases, by keeping the purchases confidential, by instructing his
staff to process the requisitions for Slade’s purchases, and by signing checks for
Slade’s purchases. See Tex. Penal Code Ann. § 7.02(a)(2). We conclude that the
evidence is not so obviously weak as to make the jury’s verdict clearly wrong and
manifestly unjust, nor is the proof of guilt against the great weight and preponderance
of the evidence. Accordingly, we hold that the evidence is factually sufficient to
support appellant’s conviction.
          We overrule appellant’s fourth and fifth issues.
“Holding” Fiduciary Property Under Section 32.45
          In his sixth and seventh issues, appellant argues that the evidence is legally and
factually insufficient to show that he “held” property because “there is no suggestion
that [he] held any property separate from established university funds.” Asserting
that the rule of “lenity” requires that ambiguous criminal statutes be interpreted in
favor of a defendant, appellant argues that because the “penal code does not define
the word ‘hold,’ . . . the common meaning of the word must be applied to the statute
in a manner that is most favorable to [him].” Contending that “hold” means
“possess,” appellant asserts that he “never held any property pursuant to an
agreement.” (Emphasis added.)
          When a statutory term is not defined by the statute itself, it should be given its
plain meaning. State v. Holcombe, 187 S.W.3d 496, 500 (Tex. Crim. App. 2006). In
determining the plain meaning of words, we initially use dictionary definitions. Id. 
“Hold” means to “have in one’s possession” or “keep or reserve for someone.” The
New Oxford American Dictionary 810 (2001). The Texas Penal Code defines
“possession” as “actual care, custody, control, or management.” Tex. Penal Code
Ann. § 1.07(39) (Vernon Supp. 2008). In the context of a fiduciary relationship,
“holds” simply refers to a fiduciary’s “care, custody, control, or management” of the
property in question. See id. §§ 1.07(39), 32.45(b).
          Appellant concedes in his briefing that “there is no mistake that [appellant] was
a fiduciary as he worked for [TSU].” Additionally, appellant acknowledges that the
evidence demonstrates that he “had control over university accounts,” transferred
money into the account that was used “to pay Slade’s bills,” and “authorized the
payment of Slade’s bills.” The bottom line is that, from the evidence in the record,
a rational trier of fact could have found that appellant exercised control over the TSU
funds that Slade used to make personal expenditures. See id. § 32.45(b). Again,
appellant instructed Rosemon to use a TSU accounting organization number to
conceal Slade’s purchases from an audit review, transferred TSU funds in a sufficient
amount to pay for Slade’s purchases, and processed requisitions for Slade’s
purchases. Appellant also signed all of the checks used for Slade’s purchases. 
Accordingly, we hold that the evidence is legally sufficient to support the jury’s
implied finding that appellant, as a fiduciary, “held” the TSU funds that Slade used
to make personal expenditures.
          Viewing the evidence in a neutral light, as outlined above, ample evidence
shows that appellant exercised control over the TSU funds that Slade used to make
her personal expenditures. We conclude that the evidence is not so obviously weak
as to make the jury’s verdict clearly wrong and manifestly unjust, nor is the proof of
guilt against the great weight and preponderance of the evidence. Accordingly, we
hold that the evidence is factually sufficient to support the jury’s implied finding that
appellant, as a fiduciary, “held” the TSU funds that Slade used to make personal
expenditures.
          We overrule appellant’s sixth and seventh issues.
Motion to Quash
          In his third issue, appellant argues that the trial court erred in denying his
motion to quash the indictment because it did not give him “sufficient notice of the
conduct which provides the basis for the prosecution.” He asserts that the indictment
did not allege “any specific acts that were the basis of the prosecution.”
          We review de novo a trial court’s denial of a motion to quash an indictment
when the trial court’s ruling is “based only on the indictment, the motion to quash,
and the argument of counsel.” State v. Moff, 154 S.W.3d 599, 601 (Tex. Crim. App.
2004). 
          An indictment must be specific enough to inform a defendant of “the nature of
the accusation against him so that he may prepare a defense.” Id.; see also Tex.
Code Crim. Proc. Ann. art. 21.11 (Vernon 2009). Everything that the State must
prove should be stated in an indictment. Tex. Code Crim. Proc. Ann. art. 21.03
(Vernon 2009). An indictment for misapplication of fiduciary property must inform
the defendant of the “specific transactions that allegedly violate the statute.” Moff,
154 S.W.3d at 603. However, if these transactions are not contained in the
indictment, the State may provide notice “by means other than the language in the
charging instrument.” Id.; Kellar v. State, 108 S.W.3d 311, 313–14 (Tex. Crim. App.
2003) (concluding that State provided adequate notice to defendant by filing itemized
list containing dates, check numbers, and amounts of each transaction).
          Here, the trial court denied appellant’s motion to quash based on all the
information “contained in the indictment and . . . [in] Exhibit A.” During the hearing
on appellant’s motion to quash the indictment, the following exchange occurred:
[The trial court]:Well, it is the Court’s understanding . . . that the
State had provided notice as to the specifics of those
transactions as referenced in the indictment or as
alluded to in the indictment through Exhibit A,
which was attached. . . . [A]m I correct?
 
[Appellant]:Yes, Your Honor.
 
[The trial court]:So with regard to [the] specific transactions that the
State is relying on, you have received notice of that,
correct?
 
[Appellant]:Yes, Your Honor.
In Exhibit A, the State informed appellant that the following specific transactions
provided the basis for the prosecution:



Vendor

Description

Amount

Purchase
Date



HLS Enterprises

Landscaping

$ 26,375.00

10/31/2005
11/4/2005
11/7/2005



HLS Enterprises

Landscaping

$ 111,784.00

11/22/2005



NOEL Furniture

Furniture

$ 23,503.95

8/29/2005



NOEL Furniture

Furniture

$ 62,963.35

8/29/2005



Simplex Grinnell

Security System

$ 5,790.00

8/24/2005



Simplex Grinnell

Security System

$ 56,010.00

8/24/2005




 
Whether the indictment sufficiently provided notice or not, “Exhibit A” provided
appellant with notice about the “individual transactions” that he allegedly engaged
in which violated the statute. See Kellar, 108 S.W.3d at 314. Accordingly, we hold
that the trial court did not err in denying appellant’s motion to quash the indictment.
          We overrule appellant’s third issue. 
 
Ineffective Assistance of Counsel
          In his first two issues, appellant argues that he was denied effective assistance
of counsel because his trial counsel did not conduct sufficient investigation into the
facts of his case and one of his trial attorneys had an actual conflict of interest due to
his employment at TSU as an adjunct professor and due to his wife’s employment at
TSU.
Standard of Review
          The standard of review for evaluating claims of ineffective assistance of
counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
2064 (1984). Strickland requires a two-step analysis whereby an appellant must show
that (1) counsel’s performance fell below an objective standard of reasonableness,
and (2) but for counsel’s unprofessional error, there is a reasonable probability that
the result of the proceedings would have been different. Id. at 687–94, 104 S. Ct.
2064–2068; Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). A
reasonable probability is a “probability sufficient to undermine confidence in the
outcome.” Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In reviewing counsel’s
performance, we look to the totality of the representation to determine the
effectiveness of counsel, indulging a strong presumption that his performance falls
within the wide range of reasonable professional assistance or trial strategy. 
Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The record must
affirmatively support the alleged ineffectiveness. Thompson, 9 S.W.3d at 813. 
          Here, appellant filed a motion for new trial in which he asserted that he was
denied effective assistance of counsel. After conducting an evidentiary hearing, the
trial court denied appellant’s motion for new trial. We review the trial court’s denial
of a motion for new trial for an abuse of discretion. See Salazar v. State, 38 S.W.3d
141, 148 (Tex. Crim. App. 2001). We note that we may not substitute our judgment
for that of the trial court but simply determine whether the trial court’s ruling was
arbitrary or unreasonable. Id. The trial court is the sole judge of the credibility of
witnesses. Id.
Pretrial Investigation
          In his first issue, appellant argues that he was denied effective assistance of
counsel because “the apparent investigation of both [his attorneys] was
constitutionally deficient” and undermines “confidence in the outcome of the trial.” 
Appellant asserts that his trial counsel “neither interviewed witnesses [nor] reviewed
potential witnesses[’] video statements.” Specifically, appellant argues that if his trial
counsel had performed an appropriate pretrial investigation, they would have
interviewed TSU “Regents Harry Johnson and Ernest Gibson.”
          At the hearing on appellant’s motion for new trial, L. Mickele Daniels,
appellant’s trial counsel, testified that he did not, prior to trial, review the videotaped
statements of the State’s witnesses, but he did review the transcripts of the witnesses’
testimony before the grand jury. When appellant sent Daniels a list of twenty-eight
potential witnesses, Daniels talked to some of the witnesses


 and read other
witnesses’ statements.


 When Daniels attempted to contact some witnesses on
appellant’s list, some refused to speak with him


 and he could not reach others.


 
Based on a subsequent conversation with appellant about the twenty-eight potential
witnesses on his list, Daniels was able to eliminate “quite a few” names. 
Nevertheless, Daniels testified that he or his co-counsel, Arthur C. Washington,
interviewed, either in person or on the telephone, all of the witnesses who testified
for appellant. He also prepared these witnesses in the witness rooms and corridor
outside the courtroom. 
          Although appellant asserts that Daniels’s “pretrial investigation was
nonexistant,” the trial court could have reasonably concluded that Daniels sufficiently
investigated the facts of the case and interviewed appropriate witnesses. Appellant
cites a number of cases to support his assertion that trial counsel must “at a minimum,
. . . interview potential witnesses.” See Bryant v. Scott, 28 F.3d 1411, 1415 (5th Cir.
1994). However, the cases cited by appellant only require that trial counsel interview
certain witnesses. See id. at 1418 (alibi witnesses); Gray v. Lucas, 677 F.2d 1086,
1094 (5th Cir. 1982) (eyewitnesses). These cases expressly recognize that trial
counsel need not interview all witnesses, only those witnesses crucial to the case. 
Bryant, 28 F.3d at 1419 n.13 (“We do not hold that the performance prong of
Strickland always requires the interview of every claimed eyewitness, alibi witness,
and/or assertedly exculpating criminal co-participant. These matters ultimately
depend on the overall context of the case.”); Gray, 677 F.2d at 1093 n.5 (“While a
lawyer’s failure to investigate a witness who has been identified as crucial may
indicate an inadequate investigation, the failure to investigate everyone whose name
happens to be mentioned by the defendant does not suggest ineffective assistance.”).
          Here, the trial court could have found Daniels’s testimony credible and
concluded that he interviewed the appropriate witnesses. Additionally, although
appellant contends that TSU Regents Harry Johnson and Ernest Gibson “had actual
knowledge of [a]ppellant’s involvement in the landscape project and the issue
regarding the purchase of furniture for Dr. Slade,” he does not explain, nor does the
record indicate, how these two witnesses were crucial to his case. 
          Appellant also argues that his trial counsel was ineffective because “[n]one of
the punishment witnesses were contacted prior to trial,” relying on Lair v. State, 265
S.W.3d 580 (Tex. App.—Houston [1st Dist.] 2008, pet. ref’d). In Lair, the
defendant’s trial counsel presented a single witness at the punishment phase when
“almost two dozen witnesses . . . were ready, willing, and able to testify on [his]
behalf at the punishment stage.” Id. at 593. Based on affidavits submitted by these
witnesses, they would have testified that the defendant “was always willing to help
people, [he] loved spending ‘countless hours’ with his children and worked with them
to improve their grades and get them involved in school activities, [his] main concern
was his children, [he] was intelligent, capable, and personable, [he] helped around his
neighborhood, [he] demonstrated honesty through specific acts and a giving and
generous nature, [he] worked countless hours to support his family’s daily needs, and
[he] was a ‘very hard worker.’” Id. At the hearing on the motion for new trial, the
defendant’s trial counsel recognized that testimony from these “additional punishment
witnesses was critical to humanize [the defendant] for mitigation purposes and was
essential in order for the jurors to seriously consider his request for the low end of the
punishment range,” i.e., five to ten years. Id. at 595–96. The defendant’s trial
counsel also admitted that “neither he nor the jurors really knew [the defendant], and
the jury returned a sentence of 70 years.” Id. at 595. Thus, this Court concluded that
“a reasonable probability exists [and] that appellant’s sentence would have been less
severe had the jury balanced the mitigating testimony from additional witnesses.” Id.
at 596.
          Here, in contrast to Lair, six individuals testified for appellant at the
punishment hearing. Appellant attached to his motion for new trial affidavits from
four additional individuals—Carolyn Noble, James Williams, Emmanuel Barnes, and
Robert Muhammad—in which they each state, “I would have testified about
[appellant’s] good character” and that he is “a suitable candidate for probation.” 
Nowhere in his briefing, motion for rehearing, or oral argument has appellant
explained how calling these four additional witnesses or spending more time
preparing the six individuals who did testify could have caused the jury to return a
less severe sentence at the punishment hearing.
          We conclude that appellant has not demonstrated that there is a reasonable
probability that the result of the proceedings would have been different but for his
trial counsel’s alleged errors. Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. 
Accordingly, we hold that the trial court did not abuse its discretion in denying
appellant’s motion for new trial based on its conclusion that appellant received
effective assistance of counsel.
          We overrule appellant’s first issue.
Conflicts of Interest
          In his second issue, appellant argues that he was denied effective assistance of
counsel because Daniels was an adjunct professor at TSU and his wife, who had been
employed as TSU’s director of accounting under appellant’s supervision, testified as
a witness for the State.
          An “actual conflict of interest” is a conflict of interest that actually requires
counsel “to make a choice between advancing his client’s interest in a fair trial or
advancing other interests to the detriment of his client’s interest.” McKinny v. State,
76 S.W.3d 463, 477 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citing Ex Parte
Morrow, 952 S.W.2d 530, 538 (Tex. Crim. App. 1997)). Such a conflict adversely
affects counsel’s performance when counsel actually acts to the detriment of his client
on behalf of those other interests during trial. Acosta v. State, 233 S.W.3d 349, 356
(Tex. Crim. App. 2007). To prove ineffective assistance of counsel based on a
conflict of interest, appellant must show that his trial counsel had an actual conflict
of interest and identify the adverse effect on specific instances of counsel’s
performance.


 Id. (citing Cuyler v. Sullivan, 446 U.S. 335, 349–50, 100 S. Ct. 1708
(1980)); McKinny, 76 S.W.3d at 477. However, even if a conflict of interest exists,
a defendant may waive his right to conflict-free counsel so long as the record
demonstrates that the defendant “knowingly, intelligently, and voluntarily waived his
right to conflict-free counsel.” Gaston v. State, 136 S.W.3d 315, 324 (Tex.
App.—Houston [1st Dist.] 2004, pet. struck) (citing United States v. Garcia, 517 F.2d
272, 277 (5th Cir. 1975)).
          Appellant first asserts that Daniels’s employment as an adjunct professor at
TSU constituted a conflict of interest. However, appellant has not identified how the
alleged conflict had an adverse effect on specific instances of Daniels’s performance. 
See Acosta, 233 S.W.3d at 356; Ex parte Morrow, 952 S.W.2d at 538; McKinny, 76
S.W.3d at 477. Accordingly, we hold that the trial court did not abuse its discretion
in denying appellant’s motion for new trial on the ground that Daniels served as an
adjunct professor at TSU.
          Appellant next argues that his trial counsel had a conflict of interest because
his wife had been a “subordinate of [a]ppellant during her employ at [TSU] and was
a witness called by the State.” However, the record demonstrates that appellant
knowingly, intelligently, and voluntarily waived his right to conflict-free counsel. 
See id. During a pretrial hearing, the trial court asked appellant to approach the
bench. The State then explained that Daniels’s wife would be testifying because she
had been “responsible for educating and making certain that people [at TSU] knew
and understood how to follow all of the policies and procedures of the university” and
had been employed at TSU “under [appellant’s] supervision.” The trial court then
asked appellant the following questions: 
 
[The trial court]:. . . [H]ave you had a chance to visit [with]
your attorneys with regard to that matter?
 
[Appellant]:Yes.
 
[The trial court]:All right. Do you have any questions to the
Court with regard to that specific matter?
 
[Appellant]:No.
 
[The trial court]:All right. Is your desire to still continue,
obviously, with Mr. Daniels and Mr.
Washington as counsel?
 
[Appellant]:Yes.

          The record demonstrates that appellant wanted Daniels to continue representing
him even after he had been informed that Daniels’s wife would be testifying for the
State. Accordingly, because appellant “knowingly, intelligently, and voluntarily
waived his right to” complain about any potential conflict related to his trial counsel’s
wife, we hold that the trial court did not abuse its discretion in denying his motion for
new trial on the ground that Daniels’s wife “was a witness called by the State.”
          During oral argument on his motion for rehearing, appellant argued that the
trial court, notwithstanding his waiver of the conflict, erred in not disqualifying
Daniels because the trial court was aware that Daniels’s wife would testify as a
witness for the State, relying on Guerrero v. United States, 546 F.3d 328 (5th Cir.
2008). Appellant does not contend that the cross-examination of Daniels’s wife by
Daniels’s co-counsel was deficient in any way. Rather, he argues that the trial court
should have disqualified Daniels and Washington because of the nature of this
conflict.
          In Guerrero, the trial court disqualified Guerrero’s trial counsel based on its
finding that his trial counsel had “actual and potential conflicts of interest.” 546 F.3d
at 331 (opining that it was inappropriate for his trial counsel to attempt to jointly
represent Guerrero and his co-defendant while also representing another individual
who had agreed to testify against Guerrero “in exchange for a reduction in his
sentence”). On appeal, Guerrero argued that the trial court erred in disqualifying his
trial counsel because Guerrero had waived the conflict. Id. at 333. The United States
Court of Appeals for the Fifth Circuit held that “the district court’s decision to
disqualify [Guerrero’s trial counsel], in light of his joint representation of Guerrero
and his brother as well as a cooperating witness, is in line with our precedent and was
not an abuse of discretion.” Id. at 334–35.
          Unlike the defendant in Guerrero, who argued that the trial court abused its
discretion in disqualifying his trial counsel, appellant asserts that the trial court
abused its discretion in not disqualifying his trial counsel. However, appellant has
not demonstrated that his trial counsel had an actual conflict of interest, which might
show that his trial counsel was ineffective. See Acosta v. State, 233 S.W.3d 349, 356
(Tex. Crim. App. 2007). An actual conflict of interest is a conflict of interest that
requires counsel “to make a choice between advancing his client’s interest in a fair
trial or advancing other interests to the detriment of his client’s interest.” McKinny
v. State, 76 S.W.3d 463, 477 (Tex. App.—Houston [1st Dist.] 2002, no pet.). 
 
          Here, Daniels’s wife, Rhoda Daniels, testified about the accounting procedures
at TSU, but her testimony did not directly implicate appellant in any wrongdoing, as
did the testimony of other witnesses. Her testimony was not of the same
confrontational nature as the testimony of the witness in Guerrero. Rather, her
testimony was duplicative of other witnesses’ testimony and uncontradicted by the
evidence presented by appellant at trial. Although there may be circumstances when
a trial court should disqualify a defendant’s trial counsel based on a conflict of
interest known to the court, this case does not present such a circumstance. 
          We overrule appellant’s second issue.
Conclusion
We affirm the judgment of the trial court.
 

 

                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Jennings, Keyes, and Higley.

Do not publish. Tex. R. App. P. 47.2(b).