# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-08-00113-CR
---

**Gary Dean Milne, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
### NO. D-1-DC-06-302362, HONORABLE BOB PERKINS, JUDGE PRESIDING
---

### M E M O R A N D U M   O P I N I O N

Appellant Gary Dean Milne was charged with tampering with physical evidence, stemming from a traffic stop during which Milne broke free from police long enough to eat a plastic bag that the officers had found in his pocket and that contained what was believed to be methamphetamine. The trial of the tampering charge was consolidated with the trial for the related charge of possession of a controlled substance. Both charges were submitted to the jury, which convicted Milne of tampering with evidence but deadlocked on the possession charge. At the punishment phase, the State called several witnesses to testify about extraneous bad acts and Milne's criminal history, while Milne called several witnesses to testify about his good character. The jury found that Milne had committed two prior offenses as alleged in the indictment and sentenced him to fifty-two years' imprisonment. Milne filed a motion for new trial, alleging ineffective assistance of counsel. The trial court held a hearing on the motion and denied the motion. On appeal, Milne

contends that trial counsel was ineffective and that the trial court abused its discretion in overruling his motion for new trial, which argued that he received ineffective assistance of counsel. We affirm the judgment of conviction.

In two issues, Milne complains that trial counsel failed to conduct a meaningful and thorough investigation into whether the roadway where Milne was stopped was under construction at the time of the traffic stop, an issue he claims goes to whether the stop was legal; that he failed to interview Milne's passenger at the time of the traffic stop to inquire about the circumstances of the stop; and that counsel failed to contact and interview several witnesses who Milne claims might have given exculpatory testimony during the punishment phase.

## Standard of Review

A defendant asserting ineffective assistance of counsel must show both that his attorney's performance fell below a reasonable standard of professional norms and that the deficient performance prejudiced the defense. *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009). To show prejudice, the defendant must establish a reasonable probability that, but for counsel's substandard performance, the trial's result would have been different. *Id*. "There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance," and we consider the totality of counsel's representation and the circumstances of the case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). "When handed the task of determining the validity of a defendant's claim of ineffective assistance of counsel, any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight." *Id.* Defense counsel has a duty to do a reasonable investigation or to make a reasonable decision that a certain

investigation is unnecessary, and we review the reasonableness of counsel's decision not to investigate in light of the circumstances, with heavy deference to counsel's judgment. *Wiggins v. Smith*, 539 U.S. 510, 521-23 (2003). We will not reverse a conviction for ineffective assistance based on a failure to investigate unless "the only viable defense available to the accused is not advanced" and we determine there is a reasonable probability that, but for the failure to advance the defense, the result of trial would have been different. *McFarland v. State*, 928 S.W.2d 482, 501 (Tex. Crim. App. 1996), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). Finally, we review a trial court's decision on a motion for new trial for an abuse of discretion, reversing only if no reasonable view of the record could support the court's decision. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

### Summary of the Evidence

At a hearing on Milne's motion to suppress, Austin Patrol Officer Patricia Bruggeman testified that on the morning that Milne was arrested, she was driving on the southbound I-35 frontage road after just making a U-turn from the northbound lanes under Ben White Boulevard. After she made her U-turn, she noticed a car about five or six car-lengths in front of her; she testified that Milne was the driver of the car. She paced Milne's car and observed that it was being driven sixty miles per hour in a fifty-mile-per-hour zone. She did not know if Milne had just exited the highway or if he had been driving on the frontage road for some distance. She did not see Milne's brake lights come on until after she turned on her overhead lights to stop him. Bruggeman also testified that the speed limit on I-35 is usually sixty-five miles per hour but, because of highway construction at the time, the speed limit had been temporarily lowered to fifty-five miles per hour.

3

Milne testified at the hearing and said that when he was stopped, he had just exited the highway and was decelerating for a red light in front of him. He said that as soon as he left the highway, he saw Bruggeman's lights behind him, so quickly that "I felt like maybe the officer had been sitting in her car just waiting with her lights off." He testified that he thought the highway's speed limit was sixty-five miles per hour at night and seventy during the day, and he said he was not speeding on the highway and so must have been driving slower than sixty-five miles per hour. He also testified that he never saw a speed limit sign on the frontage road. Milne did not testify at trial.

Defense counsel argued at the hearing that if Milne had just left the highway and was slowing for the red light, "that contradicts what the officer said, but that would certainly match up with him getting off and probably being under the speed limit unless she paced him while he was on 35. In that case, he would be under the speed limit." The trial court asked whether "the Defense challenge is that there was not an offense committed within [Bruggeman's] view," and counsel agreed. The trial court overruled Milne's motion, stating, "[I]t does seem to me from her testimony that there was probable cause to make the stop."

During the guilt/innocence phase of trial, Bruggeman testified that she had made a U-turn onto the southbound I-35 frontage road when she observed Milne's car ahead of her. She paced the vehicle for a short distance, determined that the car was going sixty miles an hour in a fifty-mile-per-hour zone, and turned on her lights to stop the car. During the stop, she discovered that Milne's license had been suspended, and so she handcuffed and arrested him for driving with a suspended license. A male officer who had come to the scene to assist Bruggeman patted down Milne's pockets and found a glass tube used for smoking crack cocaine and a small plastic bag of

4

what appeared to be crystal methamphetamine. Both items were placed on the trunk of Milne's car, and Bruggeman began to walk Milne to her patrol car when Milne turned and started back to his car, dragging Bruggeman and another officer with him. Milne reached the trunk, leaned over, and began to eat the plastic bag. The officers pulled him to the ground and applied pressure points in an unsuccessful attempt to stop him from swallowing the bag and its contents. They then called for an ambulance to make sure Milne did not overdose, and he was transported to a hospital. During an inventory search of Milne's car, the officers found a cylinder containing crystal methamphetamine between the driver's seat and the center console. The jury convicted Milne of tampering with evidence but could not reach a verdict on the possession charge.

During the punishment phase, the jury heard testimony from two women who alleged that they had been sexually assaulted by Milne. The first, Debra Torres, dated Milne for about six months in the late 1990s. She testified that the relationship was violent and mutually abusive and that in 1998 Milne sexually assaulted her after a party. She also testified that the day after the attack, she agreed to go to a concert with him, saying that Milne convinced her that "maybe it was in my imagination." Although Torres reported the attack the police, the charges were later dropped. The second woman, Krystal Evans, testified that in July 2007, Milne and a man named David struck up a conversation with her while she was standing on her apartment balcony. She invited the men into her apartment, where they drank and smoked marihuana together. During the evening, Milne twice disappeared into Evans's bedroom, and both times she asked David to get Milne out of the room. The second time, David came back and said that he could not get Milne out of the bedroom. Evans went in and saw Milne apparently passed out, but when she approached him, he pulled her onto the

5

bed, ripped off her clothes, and sexually assaulted her. After the men left, she noticed that her jewelry boxes had been emptied. She testified that about a week after the assault, which she reported to the police, Milne appeared at her door; she refused to open the door and called the police.

As defensive witnesses at the punishment phase, Milne's attorney called one of Milne's ex-girlfriends, who testified that he was "an idealist, who steps out of his way to help people," although she admitted that he had made some bad choices, mostly in relation to drinking and drug use. Milne also called his current girlfriend, who testified that he was a good person with a big heart and that he had never made her feel uncomfortable or pressured during their relationship. When she was asked about a 2006 assault report she made to the police, she said she was intoxicated at the time and that the allegations she had made were false. Three other witnesses, Milne's mother, an elderly woman for whom Milne had done some odd jobs, and Milne's cell mate during an earlier incarceration, testified about difficulties Milne had faced in his past and his good character.

**Effectiveness of Counsel During Guilt/Innocence**

During the hearing on Milne's motion for new trial, Milne's trial counsel, Keith Lauerman, testified that Milne raised the issue of whether Bruggeman had probable cause to stop Milne's car. In response, Lauerman investigated the area where the traffic stop took place, "drove the area myself prior to trial and matched that up with the facts that were alleged in the probable cause affidavit," reassuring himself that his observations "seemed compatible with what the officer was saying in the P.C." Lauerman said that he viewed two of the police videos of the stop several times but did not show the videos to Milne. He said, "I went into great detail. I viewed the videos myself about three times, and then I would convey to Mr. Milne what they said. And he

6

expressed at no time that he wanted to see them, although I went into as much detail about them as I could with him." Lauerman said, "He didn't express any interest in seeing them. And the fact was that he was on the scene and in the video, and I believe he recalled what was in the video." Lauerman stated that he watched the two videos that were introduced into evidence but did not watch two other videos, which Lauerman was told by the prosecutor were made by the backup officers who arrived at the scene after the stop had begun. He was asked whether one of the videos not shown to the jury "showed that makeshift exit off of I-35," and he answered, "I'm not aware of that."

Lauerman also testified that he knew Edward Gray was the passenger in Milne's car at the time of the stop but when asked whether Milne had asked that Gray be subpoenaed to testify, said, "I don't recall that he requested [Gray] be subpoenaed." Lauerman testified that he and Milne had discussed Gray before trial and that he decided not to call Gray as a witness because, as to the validity of the traffic stop, Lauerman did not believe Gray could testify to anything more than what Milne could present himself, and, as to the drugs found in the car, his defensive strategy was to portray Gray as having been in possession of the drugs, which, Lauerman said, "ultimately proved to be somewhat successful because the jury hung up on that issue." Lauerman testified that he had the means to contact Gray but never tried to talk to him, saying, "[I]n light of the way we were going to use Mr. Gray, I didn't think it was prudent to call him." Lauerman also testified that Milne told him that there was construction on I-35 at the time of the stop, which was more than a year before trial. Lauerman did not look into the Department of Transportation's records "because in my driving through that area, the exit ramp was located in the spot that was reflected in the P.C. affidavit, and . . . I did not see evidence of another exit ramp anywhere" in the area.

7

Milne argues that Lauerman failed to do a sufficient investigation into the condition of the highway and frontage road at the time of the stop, whether construction altered the exit ramp, whether there were visible speed limit signs, what two other police videos (not introduced into evidence at the hearing or at trial) might have shown, and whether Gray should be called to testify. However, even assuming that Lauerman should have conducted a more in-depth, independent investigation into the physical setting of the stop, Milne does not explain how he was prejudiced by any such failing. Bruggeman testified that Milne was on the frontage road, that there were two speed limit signs along that stretch of road, that she paced Milne on the frontage road, and that he was exceeding the posted speed limit. Milne testified that he had just left the highway and must have been going slower than sixty-five and denied having seen a speed limit sign. It was the court's role to determine whether Bruggeman or Milne were more credible in their testimony. *See Gutierrez v. State*, 8 S.W.3d 739, 751 (Tex. App.—Austin 1999, no pet.).

Although appellate counsel went into great detail about what Lauerman could have done to investigate Milne's version of events, he did not present evidence that showed that those investigations would have uncovered evidence showing that any construction might have altered the facts as testified to by Bruggeman, such as whether the frontage speed limit was higher than fifty at the time of the stop or whether construction on the highway resulted in speed limit signs being removed from the frontage road. Milne did not call Gray to testify at the hearing, and there is no indication that Gray had anything relevant to add to the existing evidence. Furthermore, Lauerman testified that his defensive strategy was to argue that the drugs found inside the car belonged to Gray, an argument that might have been undercut had Gray been called to testify. We will not second-

8

guess this trial strategy, which is not unreasonable on its face. *See Smith v. State*, 149 S.W.3d 667, 674 (Tex. App.—Austin 2004, pet. ref'd).

Milne has not shown that Lauerman failed to uncover something helpful to Milne's defense. Thus, assuming that Lauerman's performance during guilt/innocence was deficient, Milne has not carried his burden of showing prejudice. *See Ex parte White*, 160 S.W.3d 46, 52-53 (Tex. Crim. App. 2004) (prejudice not shown when no evidence that potential witness's testimony would have assisted defense); *Labib v. State*, 239 S.W.3d 322, 335 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (no support for ineffective-assistance claim when record did not show that failure to conduct investigation was prejudicial).[1] We overrule Milne's complaints as they relate to Lauerman's investigation during the guilt/innocence phase of trial.

**Effectiveness of Counsel During Punishment**

Milne also argues that Lauerman was ineffective by failing to conduct more investigation into Torres's and Evans's allegations of sexual assault or to find witnesses with

---

[1] *See, e.g.*, *Butler v. State*, 716 S.W.2d 48, 55 (Tex. Crim. App. 1986) (ineffective assistance when counsel failed to call punishment witnesses who would have testified in support of defendant's alibi or that defendant was not the same person witness saw running from business after robbery); *Lair v. State*, 265 S.W.3d 580, 595 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (counsel was ineffective when he failed to call mitigation witnesses when defendant produced affidavits of more than twenty people willing to testify on his behalf); *see also Duckworth v. State*, 89 S.W.3d 747, 752 (Tex. App.—Dallas 2002, no pet.) ("In his appeal, appellant alleges more investigation by counsel concerning the facts of appellant's situation would have enabled counsel to present more details regarding appellant's difficulties in meeting the requirements of his probation. Appellant also argues more investigation would have enabled counsel to better prepare appellant so that his testimony would have been more beneficial to his case. The record is silent as to any failure to investigate. Nor does the record demonstrate how more investigation would have affected the outcome of the case by leading to a lesser punishment.").

9

knowledge of the events surrounding the assaults. He argues that undermining the State's witnesses might have resulted in a shorter sentence being assessed by the jury.

Lauerman said that he informed Milne that Torres was on the witness list "sometime before trial" and denied that Milne learned of her testimony on the morning of trial. He admitted that he was told the names of two men who were at the concert with Milne and Torres, saying, "I passed that on to my co-counsel who was more or less trying to gather any punishment witnesses, and were going to certainly pursue that if Ms. Torres testified to something that was contradictory of what we thought they could provide." However, because Torres admitted having attended the concert with Milne the day after she alleged he had assaulted her, Lauerman and his co-counsel did not believe it necessary to call the men to testify.

With regard to Evans's allegations of sexual assault, Lauerman was asked about why he did not employ an investigator to locate David Omorodian, who was with Milne and Evans on the night of the alleged assault. Lauerman admitted that Milne's girlfriend provided him with Omorodian's name and that he did not hire an investigator to find Omorodian. Instead, he made an unsuccessful attempt through his own database to find Omorodian. Asked whether Milne told Lauerman that Omorodian's brother's name was Willie Strong and whether Lauerman had a client named William Strong, Lauerman said he did not recall having such a conversation with Milne or having a client by that name. Lauerman admitted that his investigation into and preparation related to Evans's allegations were based on what Milne told him, not an independent investigation. Lauerman said that he did not investigate three pages of cell-phone records that were provided by Milne's girlfriend and did not explore whether there were calls made to or from Fort Myers, Florida, or whether Evans "was from that area of the world." He said Milne's girlfriend gave him the records

10

fairly early "but then she, if I recall, told me later that they were not what she thought they were and it did not reflect what she thought they were initially when she gave them to me."

Although Milne complains that Lauerman did not conduct a sufficient investigation into the assault allegations, he does not explain what, if anything, Lauerman could have discovered other than what he learned from Milne and the complaining witnesses. As for Lauerman's failed attempt to locate Omorodian, Milne did not call Omorodian to testify at the hearing, nor did he establish that it was possible to locate Omorodian, other than to ask whether Lauerman knew Omorodian's brother's name or whether he might have had a client with a name similar to Omorodian's brother, questions to which Lauerman gave negative answers. Without some evidence that Omorodian could have provided useful testimony, Milne has not shown any prejudice from Lauerman's failed attempt to find Omorodian. Similarly, Milne did not produce the phone records that he argues *might* have shown calls to or from Evans or, at least, an area in Florida where she *might* have lived, nor was there testimony that the records actually contained information that might have undermined Evans's testimony or assisted Milne's defense. Lauerman next testified that he decided it was unnecessary to call two witnesses who were at the concert with Milne and Torres the day after Milne allegedly assaulted her. Milne's first complaint is that without knowing how the men would testify, Lauerman could not evaluate their usefulness as witnesses, but Lauerman testified that because Torres admitted attending the concert, her credibility was damaged and further testimony that she was there would have added little to the evidence. We will not second-guess Lauerman's determination of this issue. *See Smith*, 149 S.W.3d at 674. Milne also argues that without interviewing the witnesses from the concert, Lauerman could not have been prepared to call them "in the event that Ms. Torres provided testimony that ran contrary to his expectations." However,

11

Torres did not testify contrary to Lauerman's expectations, and, thus, there was no prejudice even if Lauerman was unprepared for a contingency that did not arise. We overrule Milne's complaints related to Lauerman's representation at the punishment phase.

## Conclusion

In summary, although Milne asserts that Lauerman should have conducted more thorough investigations; located, interviewed, and called more witnesses; requested highway construction records; or looked into Milne's phone records, Milne did not produce any evidence that any of those efforts would have provided evidence useful to his defense. Without some evidence that Lauerman somehow failed to present an adequate defense, even assuming that Lauerman's investigations in this case did amount to deficient performance, Milne has not carried his burden of showing prejudice. *See White*, 160 S.W.3d at 52-53. We overrule Milne's complaints on appeal and affirm the trial court's judgment.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: April 23, 2010

Do Not Publish

12