

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00049-CR

TIMOTHY CHAD SMITH                                             APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

----------

## FROM THE 97TH DISTRICT COURT OF MONTAGUE COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Timothy Chad Smith appeals his conviction for possessing at least four hundred grams of methamphetamine.[2]  In two issues, he contends that the trial court abused its discretion by allowing inadmissible hearsay testimony and that the evidence is insufficient to support his conviction.  We affirm.

----

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Health & Safety Code Ann. §§ 481.102(6), .115(a), (f) (West 2010).

## Background Facts

One evening in October 2008, Jonathan Cheshire, a Montague County Sheriff's Office deputy, received a dispatch indicating that there was a structure fire on Fruitland Road, which runs through a residential neighborhood. Deputy Cheshire arrived at the scene and saw fire department personnel extinguishing the fire, which had destroyed a mobile home located approximately a hundred feet away from the road. Appellant was sitting near the residence and wearing only shorts, socks, and glasses; he was disturbed and had blood on his body. He told Deputy Cheshire that he had been alone and was not sure how the fire started but that he had to break his bedroom window to escape the mobile home.

Deputy Cheshire contacted Bowie Fire Department Chief Douglas Page.[3] Upon arriving, near the south side of the residence, Chief Page found a glass jar containing a white powdery substance that looked like methamphetamine.[4] Deputy Cheshire and Chief Page asked Officer Chris Hughes to come to the residence.[5] Officer Hughes talked to appellant, who did not appear to have recently used alcohol or a controlled substance. Appellant told Officer Hughes

---

[3]Chief Page was called to investigate the cause of the fire, but he could not determine a cause.

[4]This jar was left at the scene and was not examined to validate its contents.

[5]Officer Hughes worked for the Bowie Police Department in October 2008 but worked for a district attorney's office at the time of the trial. Toward the end of his tenure with the Bowie Police Department, Officer Hughes was a narcotics investigator.

that he was sleeping in his bedroom when he woke up to a house that was full of smoke and jumped out of his window. Without hesitation and while stating that he had nothing to hide, appellant gave consent for Officer Hughes to search the property.

Officer Hughes found a cooler near appellant's mobile home. The cooler contained jars and pitchers that held a liquid with a "strong chemical smell." Officer Hughes collected a sample of the strong-smelling liquid.

A forensic scientist determined that four of the containers that the police had found in the cooler each contained large amounts of methamphetamine.[6] A Montague County grand jury indicted appellant for possessing four hundred grams of methamphetamine or more. Appellant pled not guilty. The jury found him guilty and assessed forty years' confinement as his punishment. The trial court sentenced appellant to the same term, and he filed notice of this appeal.

**Evidentiary Sufficiency**

In his second issue, appellant argues that the evidence is insufficient to support his conviction. In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

---

[6]Appellant concedes on appeal that the "[S]tate's expert found methamphetamine when testing the substance."

3

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).[7]

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we determine "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. The standard of review is the same for

---

[7]Appellant contends that the evidence is legally and factually insufficient. Because the court of criminal appeals held in *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010), that there is no meaningful distinction between the factual sufficiency standard and the legal sufficiency standard, we analyze appellant's insufficiency arguments under only the *Jackson* sufficiency standard. *See* 443 U.S. at 319, 99 S. Ct. at 2789.

direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

A person commits an offense by intentionally or knowingly possessing methamphetamine. *See* Tex. Health & Safety Code Ann. §§ 481.102(6), .115(a); *Triplett v. State*, 292 S.W.3d 205, 206 (Tex. App.—Amarillo 2009, pet. ref'd). "Possession" means actual care, custody, control, or management. Tex. Health & Safety Code Ann. §§ 481.002(38) (West 2010); *see Garrett v. State*, 161 S.W.3d 664, 671–72 (Tex. App.—Fort Worth 2005, pet. ref'd) ("An accused possesses a controlled substance when he exercises actual care, control, or custody over the substance; is conscious of his connection with the substance; and knows what the substance is."). As we have explained,

> The evidence "must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous. This is the whole of the so-called 'affirmative links' rule."
>
> . . . .
>
> . . . Factors we consider include . . . whether the contraband was in plain view, . . . the defendant's proximity to and the accessibility of the narcotic, . . . whether the defendant was under the influence of narcotics when arrested, . . . whether the defendant possessed other contraband or narcotics when arrested, . . . whether the defendant made incriminating statements when arrested, . . . whether there was an odor of the contraband, . . . whether other contraband or drug paraphernalia were present, . . . whether the defendant owned or had the right to possess the place where the drugs were found, . . . whether the place where the drugs were found was enclosed, . . . [and] whether the conduct of the accused indicated a consciousness of guilt.

*Tucker v. State*, 183 S.W.3d 501, 510 (Tex. App.—Fort Worth 2005, no pet.) (citations omitted); *see McQuarters v. State*, 58 S.W.3d 250, 259 (Tex. App.—Fort Worth 2001, pet. ref'd).

The officers found the jars and pitchers that contained the large amount of odorous methamphetamine inside a cooler that was in plain view and that was located ten to twenty feet away from appellant's mobile home. Officer Hughes testified that he believed that the cooler's lid was open when he found it. Appellant told Officer Hughes that he was the only person who had lived in the mobile home, that he had "full control of the property," and that only he had access to the property.

Along with his seemingly exclusive possession of the property where the methamphetamine was found, many items found on appellant's property also link him to the methamphetamine. Close to the mobile home, Chief Page and Deputy Cheshire found many empty starting fluid cans, some in a burn pile (about fifteen feet off the west end of the mobile home) and some in barrels (on the east end). The cans had holes punched in them. Deputy Cheshire testified that methamphetamine manufacturers will "remove ether from starting fluid cans and they'll punch a hole at the bottom of the can to remove the ether." Chief Page stated, "The chemical ether, what they do, they'll expel the propellant out of the can. Take a can opener or another object and punch the can and drain the liquid from the can." According to Chief Page, manufacturers then mix the liquid with pseudoephedrine tablets. Chief Page recognized that starter fluid may be

6

used by people who repair cars, but he said that he did not see any evidence of mechanical work underway at the mobile home. Although Officer Hughes said that appellant's family owns a diesel repair shop and that such a shop could use starting fluid, he testified,

> [N]ormally, a starting fluid can won't have a hole poked in the bottom of it unless it's been used to manufacture methamphetamine. They'll take the can, invert it, spray all of the propellant out of the can, and then poke a hole in the can. Once all of the pressure is released, then they pour the ether out of the can.
>
> . . . .
>
> . . . The ether is a chemical solvent used in the manufacturing process.

In one of the barrels, Officer Hughes also found the remains of an HCL generator, which, according to Officer Hughes, is

> used to produce hydrogen chloride gas. It is some type of vessel -- in this case, a Dr. Pepper bottle. They'll put salt in it and then pour acid over the salt and that produces a hydrogen chloride gas which is bubbled through meth oil. And when that's bubbled through there, it changes the PH and the meth oil becomes methamphetamine, like the usable methamphetamine. And then after that, it's filtered over and you get your usable meth from the liquid substance.

The HCL generator that Officer Hughes found had a "cap on it with a rubber hose coming off of the top." Officer Hughes did not seize the HCL generator because the gas it releases is toxic and can cause health problems. The jury could have reasonably inferred that appellant attempted to protect himself from such problems because Deputy Cheshire found a chemical mask at the south end of the mobile home.

7

Finally, Chief Page found a glass jar containing a white powdery residue that looked like methamphetamine. Although the substance was not tested, Chief Page testified, "The glass jar[] is another apparatus that they will use in the manufacture of methamphetamine, and it's pretty common that once the liquid has been removed, over a period of time, the white residue will remain inside of the glass jars."

Appellant recites some facts that could support his theory that someone else placed all of these drug-related items on his property. For example, Deputy Cheshire testified that there were two residences within about two hundred feet of appellant's mobile home.[8] Deputy Cheshire also admitted that people who run clandestine methamphetamine labs often dump their trash on the side of the road. Finally, he conceded that it is uncommon for someone who runs a drug laboratory to be cooperative with police officers, as appellant was. Chief Page testified that there was not a barrier between the road and the mobile home that would prevent someone from dumping cans in the burn pile or barrels.

Chief Page and Officer Hughes testified, however, that the starting fluid cans in the barrels and burn pile did not appear to have been placed there recently. Officer Hughes believed that the starting fluid cans were burned and damaged at earlier times. The jury could have reasonably inferred, therefore, that appellant had attempted to destroy the evidence of his own manufacture of

[8]Kenneth, appellant's father, testified that he owned the property that appellant's mobile home was on.

methamphetamine by burning the cans. And even if an outsider used appellant's property to dump trash associated with manufacturing methamphetamine, one would not expect the outsider to also deposit evidence of manufactured methamphetamine.

Appellant also argues that his cooperation with the police officers and his consent to their search renders the evidence insufficient that he knew the methamphetamine was on his property. But Texas courts have upheld convictions for possessing controlled substances, despite defendants' cooperation with the police, when there were other facts that linked the defendants to the substances. *See, e.g.*, *Lair v. State*, 265 S.W.3d 580, 584–88 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *Jones v. State*, 963 S.W.2d 826, 830 (Tex. App.—Texarkana 1998, pet. ref'd).

Viewing all of the evidence in the light most favorable to the prosecution, we conclude that a rational jury could have found, beyond a reasonable doubt, that appellant intentionally or knowingly exercised care, custody, control, or management over the methamphetamine found in plain view near his mobile home. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. Thus, we overrule his second issue.

## Appellant's Evidentiary Objection

In appellant's first issue, he asserts that the trial court abused its discretion by allowing testimony about a statement made by Kenneth (his father), which appellant alleges was inadmissible hearsay. Outside of the jury's presence, in

9

response to the State's questions, the trial court heard proposed testimony from Officer Hughes about his conversation with appellant on the evening of the fire, and the following colloquy occurred:

> Q      Did you ask [appellant] about the other containers [with] the liquid contents?
>
> A      The cooler up front, yes, I asked him about those.
>
> Q      And how did he respond?
>
> A      I believe he told me he didn't know what that was and had never seen them before.
>
> Q      At that point, was anyone else present to hear those remarks?
>
> A      The defendant's father.
>
> Q      And were there remarks made by the defendant's father in his presence?
>
> A      There was.
>
> Q      Who is the defendant's father?
>
> A      Ken or Kenneth Smith.
>
> Q      And what -- and did he respond spontaneously; that is, without any question being asked of him?
>
> A      He did.
>
> Q      And what did he state?
>
> [DEFENSE COUNSEL]:  Your Honor, that I'm going to object to because it will be hearsay in front of the jury.  So I'll make a hearsay objection to Mr. Smith's father's comments.
>
> [THE STATE]:  Okay.  If we can proceed, I think I will be able to respond to the objection better.
>
> THE COURT:  All right.

Q . . . If you would, state what he told you or what he said rather.

A He said I know where they came from. Those are tea pitchers that are missing from my house.

Q And you said these remarks were said in the presence of the defendant?

A Yes.

Q When the remarks were made, did the respondent -- excuse me, did the defendant respond in any way?

A Not that I remember.

Q Okay. Particularly, did he make any denial of the origin of those pitchers or any comment upon his father's remarks?

A Not at that point. Prior to that, he had stated that he had never seen them before.

The State argued that Kenneth's statement that he knew where the tea pitchers came from was not hearsay because it was an adoptive admission. *See* Tex. R. Evid. 801(e)(2)(B); *Gant v. State*, 153 S.W.3d 294, 299 (Tex. App.— Beaumont 2004, pet. ref'd) (holding that an adoptive admission "occurs when a statement is made in the defendant's presence, the defendant understands the statement, the statement calls for a reply, and the defendant remains silent or acquiesces to the statement, although not under arrest"), *cert. denied*, 547 U.S. 1023 (2006). Outside the presence of the jury, the trial court overruled appellant's objection to Officer Hughes's testimony about Kenneth's statement. During Kenneth's own testimony, he denied stating on the night of the fire that the jars had been missing from his home. In rebuttal, the State recalled Officer

11

Hughes, who testified in front of the jury over appellant's objection, "[Appellant's] father stated: I know where they came from. Those are my tea pitchers that are missing from my house."

Assuming, without deciding, that the trial court abused its discretion by admitting Officer Hughes's testimony about Kenneth's statement, we must determine whether that alleged error caused harm. *See* Tex. R. App. P. 44.2. Any error, other than constitutional error, that does not affect substantial rights must be disregarded. *See* Tex. R. App. P. 44.2(b). The alleged error in this case is not of constitutional dimension. *See Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Davis v. State*, 268 S.W.3d 683, 709 (Tex. App.—Fort Worth 2008, pet. ref'd) ("Because error in admitting a statement in violation of the hearsay rules of evidence is non-constitutional, we apply rule 44.2(b)."); *Moon v. State*, 44 S.W.3d 589, 594 (Tex. App.—Fort Worth 2001, pet. ref'd) ("The admission of otherwise inadmissible hearsay is a nonconstitutional error.").

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). When conducting a rule 44.2(b) harm analysis, we review the record as a whole, including any testimony

12

or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, and closing arguments. *Id.* at 355–56.

Appellant contends that the admission of Officer Hughes's testimony about Kenneth's statement was harmful because it was the "only link of ownership or possession offered to the jury[,] and without this testimony there would have been insufficient evidence to convict." During the prosecutor's closing argument, he called Kenneth's statement "significant." As we explained above, however, even if Officer Hughes's testimony about Kenneth's statement had not been admitted, items of physical evidence, in plain view and interspersed on various parts of appellant's property, connected appellant to the methamphetamine found near his mobile home, which he said that he exclusively occupied and controlled. Without the aid of Kenneth's allegedly inadmissible statement, the jury could have rationally rejected appellant's defensive theory that the methamphetamine was not his based on the proximity and amount of this physical evidence. Although Kenneth's statement may have provided a more specific reason for the jury to reject appellant's theory that someone had dumped the drug-related materials by his mobile home, we cannot conclude that the evidence of Kenneth's statement likely moved the jury from acquitting appellant to convicting

13

him.  *See* Tex. R. App. P. 44.2(b); *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (stating that in determining harm, we may ask whether there is a reasonable possibility that the error "moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question"), *cert. denied*, 532 U.S. 944 (2001); *see also Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008) ("Assuming without deciding that the trial court erred in admitting the surveillance videotapes or ATM receipts, such error was harmless in light of the overwhelming evidence of guilt shown by other evidence . . . ."), *cert. denied*, 129 S. Ct. 1037 (2009).

Furthermore, Kenneth conceded at trial that he had said on the night of the fire that the jars and pitchers that the officers found in the cooler "probably [came] from [his] property or [came] from [his] house."  This statement is similar to (although more equivocal than) the statement that Officer Hughes attributed to Kenneth.  During cross-examination by appellant's counsel, Kenneth said that his statement on the night of the fire was a "figure of speech" and expressed that similar containers could be bought at stores.  But when appellant's counsel asked Kenneth whether he had any markings on the jars and pitchers that had been admitted into evidence and were in front of him, he said, "Well, no.  They just mixed tea in them is all I used them for."  No one objected to this testimony. Potential harm from the improper admission of hearsay evidence is lessened when the trial court admits similar evidence without objection.  *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998); *see also Matz v. State*, 21

14

S.W.3d 911, 912 (Tex. App.—Fort Worth 2000, pet. ref'd) ("It is well-established that the improper admission of evidence does not constitute reversible error if the same facts are proved by other properly admitted evidence.") (op. on remand).

For all of these reasons, we hold that even if the trial court erred by admitting Officer Hughes's testimony concerning Kenneth's statement, that alleged error did not affect appellant's substantial rights. We must therefore disregard the alleged error. *See* Tex. R. App. P. 44.2(b). We overrule appellant's first issue.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  September 29, 2011

15